STATE EX REL. LA FOLLETTE and others, Appellant, vs. KOHLER, Respondent.

*December 7, 1929—February 4, 1930.*

520

522

526

531

532

533

534

537

540

544

*Walter D. Corrigan, Sr.,* of Milwaukee and *Harold M. Wilkie* of Madison, for the appellant.

For the respondent there was a brief by *Olin & Butler* of Madison, attorneys, and *Harry L. Butler* and *Herbert H. Thomas* of Madison and *Edwin S. Mack* of Milwaukee, of counsel; and the cause was argued orally by *Mr. Butler, Mr. Thomas, Mr. Mack,* and *Mr. Lucius P. Chase* of Kohler.

ROSENBERRY, C. J.    The question presented upon this appeal is whether or not the complaint alleges facts sufficient to entitle the plaintiff to the relief prayed for in the

complaint. It is not contended by the respondent that if the statutes, violation of which is alleged in the complaint, are valid enactments, the allegations of the complaint are not sufficient to entitle the plaintiff to the relief prayed for. The contention made by the respondent is that the statute is void and unconstitutional as applied to the governor because (a) the qualifications of the governor and the method by which he may be removed from office are prescribed by the constitution and are thereby placed beyond the power of the legislature; (b) that the statute is void as an unreasonable limitation upon the right of free speech and operates to deny a candidate due process of law and equal protection of the laws.

We shall consider first the proposition that the act is void and unconstitutional as applied to the office of governor. At this point it is not improper for us to say that we realize the importance which attaches to the decision in this case whatever it may be. A correct solution of the questions presented is of far greater importance than the personal or political fortunes of any candidate, incumbent, group, faction, or party. We are dealing here with laws which operate in the political field,—a field from which courts are inclined to hold aloof,—a field with respect to which the power of the legislature is primary and is limited only by the constitution itself. It has been said so many times it scarcely needs to be said again, that the realization of the democratic ideal of self-government rests upon an intelligent, informed, honest, and vigilant electorate. It is because of this that a large percentage of the public revenues is devoted to the education of our youth in order that they may not only be informed but have their consciences awakened to their duties as citizens. All efforts to educate and awaken the electorate amount to nothing if corrupt appeals made to its prejudices or its cupidity lead it to cast a ballot otherwise than in accordance with its convictions, uninfluenced by anything save

considerations of public policy. A democratic state must therefore have the power to protect itself against the consequences of ignorance, indifference, and venality and prevent all those practices which tend to subvert the electorate and substitute for a government of the people, by the people, and for the people, a government guided in the interest of those who seek to pervert it. That self-government by the people is threatened today wherever it exists throughout the world is recognized by every thoughtful person. The threat arises from the inaction and indifference of those qualified to exercise primary political power, the electorate, and from the influence of sinister and subversive forces set in motion by those who would prompt governmental action favorable to their private interests without regard to its effect upon the public interest. The case for and against democracy is fully set out and elaborated by Lord Bryce in his work on *"Modern Democracies."* He was the most profound student of democratic institutions of his day or perhaps any day. He had great confidence in the future of democracy, but one can well read between the lines, in spite of his incurable optimism, that he had many misgivings as to the future of democracy for the reasons which have already been indicated. There are some other fundamental matters to which some attention should be given.

There are two views with respect to the nature of the right of suffrage. The great weight of authority is to the effect that the right of suffrage is neither a natural, an absolute, nor a vested right of which a man cannot be deprived except by due process of law, but it is purely a conventional right and may be enlarged or restricted, granted or withheld at pleasure in the absence of constitutional restrictions; and that the right of suffrage does not exist except as it is given by the constitution and laws enacted pursuant to it.[1]

---

[1] See cases cited 9 Ruling Case Law, p. 979, § 4; 6 Ruling Case Law, p. 287, § 273.

On the other hand, some authorities hold that it is a natural inherent right included within the liberties and immunities guaranteed to every citizen in a republican form of government and of which he may not be deprived except by due process of law.[2]

This court, however, has adopted a view which does not conform wholly to either of the views stated. So far as the questions arising in this case are concerned, the adoption of either view would lead us to the same conclusion.

In *State ex rel. McGrael v. Phelps* the court said:

"The right to vote is one reserved by the people to members of a class and as so reserved, guaranteed by the declaration of rights and by sec. 1, art. III, of the constitution. It has an element other than that of mere privilege. It is guaranteed both by the bill of rights, and the exclusive entrustment of voting power, contained in sec. 1, art. III, of the constitution; and by the fundamentally declared purpose of government; and the express and implied inhibitions of class legislation, as well. Such declared purpose and the declaration of rights, so far as they go, and the equality clauses,—constitute inhibitions of legislative interference by implication, and with quite as much efficiency as would express limitations, as this court has often held. (Citing cases.)

"Thus the right to vote is given a dignity not less than any other of many fundamental rights." [3]

Under our constitution the right of suffrage is a constitutional right vested in those who possess the qualifications prescribed by the constitution. Whether it is vested by reservation or grant it is not necessary to inquire at this time. In theory the sovereign political power of the state rests in the people; in practice, however, it is exercised by those individuals within the state who possess the qualifications prescribed by the constitution, who must proceed in the man-

[2] See *State v. Edwards*, 95 W. Va. 599, 122 S. E. 272.
[3] 144 Wis. 1, at p. 14, 128 N. W. 1041. See, also, *State ex rel. Melms v. Young*, 172 Wis. 197, 178 N. W. 481.

ner indicated by the constitution and statutes to exercise it. The constitution having fixed the qualifications, persons falling within the classification thus established may not be deprived of their right by legislative act and the right is protected by the applicable constitutional guaranties.[4]   The persons who may exercise the right of suffrage and the day of election are fixed by the constitution.   These provisions are not and were never intended to be self-executing or exclusive of regulation in other respects.   By sec. 1 of art. IV the power of the state to deal with elections except as limited by the constitution is vested in the senate and assembly, to be exercised under the provisions of the constitution; therefore the power to prescribe the manner of conducting elections is clearly within the province of the legislature.

In the beginning the regulations were few and simple. Persons went to the voting places fixed by law and there delivered to officers whose duties were prescribed by statute a paper upon which they signified their choice of officers: The ballots might be written, printed, partly written, partly printed, and any sort of combination of persons who were candidates might be printed or written upon a ballot.[5]   The gross and notorious abuses which followed from this loose practice soon led to the introduction of the Australian ballot, accompanied by certain restrictions relating to registry, residence within the election district, and other matters which were well within the power of the legislature to prescribe. While our constitutions, state and national, make no mention of parties, it is and was manifest that as a practical matter democracy could only determine upon a course of political conduct by means of parties.   Party nominations gave to candidates great advantage at the polls.   Designing persons were not slow to take advantage of the situation,

---

[4] *State ex rel. McGrael v. Phelps,* 144 Wis. 1, 128 N. W. 1041; *State ex rel. Van Alstine v. Frear,* 142 Wis. 320, 125 N. W. 961.

[5] Stats. 1839, p. 38, par. 10; Stats. 1849, p. 68, ch. 6, secs. 28, 29.

and the old caucus and convention system became so permeated with fraud and corruption that it was swept into the discard and a system of nominations by primary election substituted for it.[6]  The enactment of all these laws tending to regulate the exercise of political power by those intrusted with the suffrage gave rise to rights which, although they operated in the field of politics, were recognized and enforced by courts.[7]  The courts did not declare the rights; they recognized and enforced the rights created by the legislature in the field of political action.  It was held at common law that one who secured a plurality of votes cast at an election by means of fraud, bribery, intimidation, coercion, or misconduct of election officials, derived no title thereby to the office for which he was a candidate.[8]  In cases where the wrongdoing was such as to make it impossible to ascertain the true result of the election, there was held to be no election, or, as the phrase goes, "the election was held void."[9]  In such a situation the opposing candidate could not be declared elected because it could not be found that he had received a plurality of the lawful votes cast.  Likewise where the candidate receiving the largest number of votes was by virtue of the constitution or of the laws ineligible to the office, the election was held void.  An ineligible candidate could not be elected because the constitution or the law said he could not be.[10]  His opponent could not be declared elected because he had not received the necessary plurality, and in such case it is universally held that there was no election and the election is void.  There is one ap-

---

[6] Ch. 451, Laws of 1903.

[7] *State ex rel. Barber v. Circuit Court,* 178 Wis. 468, 190 N. W. 563; *State ex rel. Att'y Gen. v. Cunningham,* 81 Wis. 440, 51 N. W. 724; *State ex rel. Lamb v. Cunningham,* 83 Wis. 90, 53 N. W. 35.

[8] *State ex rel. Newell v. Purdy,* 36 Wis. 213.

[9] *State ex rel. Bell v. Conness,* 106 Wis. 425, 82 N. W. 288.

[10] *State ex rel. Dunning v. Giles,* 2 Pin. 166.  See note to this case, 52 Am. Dec. 149.

parent, not real, exception, and that is where the electors knowingly vote for a person who is disqualified. Knowing of the disqualifications, their votes are said to be worthless and not to be counted and the opposing candidate may be declared elected.[11]

At common law the tendency of the courts was to apply a strict rule of evidence, and the alleged fraud, bribery, coercion, or intimidation, as the case might be, was required to be established clearly. Manifestly, attempts to establish such misconduct as would avoid the election was attended with large expense and great practical difficulties in securing proof. It was only in the most glaring cases that the jurisdiction of the courts was invoked, as where some large personal or political interest was at stake. Beginning in the eighties in England and rapidly extending throughout the English-speaking world, means were sought to prevent the perversion of the electorate. This search resulted in the enactment of so-called corrupt and illegal practices acts to be found now in the laws of practically every state in this Union, in England, and throughout the colonies.[12] What these laws sought to do was to regulate the conduct of campaigns for election by limiting the amount of money which might be spent and designating the purposes for which the limited amount might lawfully be disbursed. The general feature of these laws is that it is provided that where a candidate for an office violates the provisions of the law his election thereto shall be void; that is, it shall be no election. Laws have been enacted which provide that in such an event the opposing candidate having the next highest number of votes should be declared elected, but these have been held unconstitutional where the constitution of the state is like ours, which provides that the person receiving the highest

[11] *State ex rel. Bancroft v. Frear*, 144 Wis. 79, 128 N. W. 1068.
[12] See Sikes, Corrupt Practices Legislation, tabulations beginning on page 258.

number of votes shall be elected. Under such circumstances the person receiving less than that number cannot be elected.[13]

The power of the legislature in this field is admittedly very broad. It is not limited to the enactment of laws which merely amplify or enlarge the offenses of corruption, bribery, coercion, intimidation, and misconduct as those terms were defined at common law. It is within the power of the legislature to prescribe what constitutes a reasonable disbursement and what are proper methods of disbursement, and to provide that a violation of the law shall as to the offender render the election void. It is conceded in the briefs, and we think quite advisedly, that there can be no constitutional objection to the exercise of such power with respect to all officers other than the so-called constitutional officers, meaning thereby the governor, lieutenant governor, secretary of state, state treasurer, and the attorney general. This court has so held.[14]

These considerations bring us to the crux of this case. First of all, what is it that the statute seeks to do? After providing what may and may not be done, sec. 12.22 provides that any elector may institute a proceeding in the manner there prescribed to determine whether or not a candidate has violated the provisions of the act.

Sec. 12.23 provides how the proceeding may be instituted, what pleadings may be required, and other provisions relating to the trial, evidence, and costs.

Sec. 12.24 provides:

"If the court shall find that the candidate whose right to any office is being investigated, or his personal campaign committee or any member thereof has violated any provision of this chapter, in the conduct of the campaign for nomina-

---

[13] *McKinney v. Barker*, 180 Ky. 526, 203 S. W. 303.
[14] *State ex rel. Schumacher v. Markham*, 160 Wis. 431, 152 N. W. 161.

tion or election, . . . judgment shall be entered declaring void the election of such candidate to the office for which he was a candidate, and ousting and excluding him from such office and declaring the office vacant."

There would seem to be little doubt that the clear legislative purpose was to declare that a violation of the act by a candidate should render his election void. It is difficult to read anything else out of it. If the election is void and the candidate has intruded into the office, it is clear that he had no right thereto, and a judgment of ouster excluding him from the office and declaring it vacant is merely a summary and expeditious method of removing him therefrom. He does not by misconduct forfeit an office once lawfully acquired. He never secures title to it. It does not shorten his term because he was never elected. It terminates the term of his intrusion into the office.

The trial court was of the opinion that the question was one of eligibility, basing his opinion upon a passage in the opinion in the *Markham Case*. We are of the opinion that the language is not open to that construction. The court said:

"We do not construe the statute as prescribing any new qualification or test of eligibility for the office of district attorney. Saying that a man who commits a criminal offense in pursuing his endeavor to secure a nomination or an election shall not be entitled to hold the office, is not prescribing a qualification, but is rather imposing a penalty for violating the law. The aim of the statute is to require the aspirant for office to resort to honest means to get it. . . . The violation of the statute goes to the right to hold office, just as does a question of eligibility or of failure to secure a majority of the votes, and accused candidates have the right to say that only a jury of their peers shall convict them." [15]

[15] *State ex rel. Schumacher v. Markham*, 160 Wis. 431, at p. 437, 152 N. W. 161.

What the court said in the *Markham Case* was that the question of whether or not the election was void determined Markham's title to the office and therefore he was entitled to a jury trial. If the statute did not as applied to the district attorney prescribe what constituted eligibility to the office, it certainly cannot be held to do so in the case of the governor. If the statute prescribed in the case of the governor additional qualifications to the office, to wit, that he should not violate the law in attempting to secure the office, and he had nevertheless received a plurality of the votes at a valid election, his title to the office would be perfect, and he could thereafter be removed from the office only in the manner prescribed by the constitution. It is a well established principle of constitutional law that where qualifications are prescribed by the constitution and the methods of removal are provided by the constitution, the constitution in those respects is exclusive and it is beyond the power of the legislature to prescribe additional qualifications or to provide for removal in other than the constitutional method.[16] Quite obviously the statute here under consideration was framed with due regard to these fundamental principles, and so it is provided that violation of the statute by one who receives a plurality of votes prevents an election. A candidate under such circumstances gains no title through such a proceeding even though, as was pointed out in the *Markham Case*, he secures a certificate of election. When the fact that a candidate has violated the statute becomes established in the manner provided by the statute, the certificate is manifestly of no effect because there was no election. The certificate of election is not a title; it is a mere muniment of title, evi-

---

[16] *Dinan v. Swig*, 223 Mass. 516, 112 N. E. 91; *Falloon v. Clark*, 61 Kan. 121, 58 Pac. 990; *Attorney General v. Tufts*, 239 Mass. 458, 131 N. E. 573, 132 N. E. 532; *Dickson v. Strickland*, 114 Tex. 176, 265 S. W. 1012.

dence of title. What the statute in effect does is to create a conclusive presumption that a violation of the statute chargeable to the person receiving the highest number of votes renders his election void because the result was achieved by practices declared by the statute to be corrupt and illegal. We are cited to no cases and we find none holding that it is not competent for the legislature to enact such a law. Certainly the right to vote is no more sacred or inherent than the right to life, liberty, and property. It is in fact less so. The right to property may be defeated or lost by failure to comply with a statute, as for instance by making a sale of a stock of goods without complying with the Bulk Sales Act, although no fraud may in fact have been perpetrated;[17] or because of a failure to file a conditional sales contract or chattel mortgage although no one is in fact defrauded thereby.[18] Certainly there is nothing inherently immoral in giving a rebate in the shape of a trading stamp to a customer, but because it might constitute a lure to improvidence it was held to be within the power of the legislature to regulate or prohibit it and to limit the right of contract accordingly.[19] And so in innumerable ways these fundamental rights are subject to limitations and regulations in the interest of public safety, health, morals, and welfare.

It is argued that because the constitution (sec. 3 of art. V) says the governor and lieutenant governor shall be elected by the qualified electors of the state at the times and places of choosing the members of the legislature, and that it is provided by sec. 4 of art. IV, "The members of the assembly shall be chosen biennially, by single districts, on the Tuesday succeeding the first Monday of November," and an election has been held pursuant thereto, it is beyond the power of the

[17] *Gazett v. Iola Co-operative M. Co.* 164 Wis. 406, 160 N. W. 170.
[18] *First Nat. Bank v. Biederman,* 149 Wis. 8, 134 N. W. 1132.
[19] *Trading Stamp Cases,* 166 Wis. 613, 166 N. W. 54.

legislature to declare that as to a candidate for governor an election so held shall be void by reason of the misconduct of the candidate. It is conceded that if a candidate were guilty of bribery, his election might be declared void for that reason or any other reason which was recognized as sufficient at common law.[20]

What was meant by the use of the term *election* in the constitution? In the first place it constitutes an exercise of the sovereign political power of the state through those who are entitled to the right of suffrage under the provisions of the constitution and of the law. The constitution does not attempt to define what is meant by the term *election*. Elections were provided for by the laws of the territory which the framers of the constitution had before them. It was a term well understood. Our constitution (sec. 3, art. V) provides: "The persons respectively having the highest number of votes for governor and lieutenant governor shall be elected."

In the *Barstow Case* the incumbent had been awarded a certificate of election but it was avoided because it did not certify to the truth. If the person receiving the highest number of votes is not eligible there is no election; equally if the highest number of votes for any candidate were procured by bribery or intimidation, there is no election. Manifestly what the framers of the constitution had in mind and what they intended to say and what they did say was that the person receiving the highest number of lawful votes cast at a valid election for governor should be elected. At the common law as it existed at the time the constitution was framed and adopted, an election which was procured by fraud, intimidation, or corruption was no election. The constitution did not attempt to prescribe how elections should be held or what should constitute a valid election. Conse-

[20] *Attorney General ex rel. Bashford v. Barstow*, 4 Wis. 567, 674.

quently the sovereign power of the state to deal with that matter was passed to the legislature subject only to the constitutional limitations. The power of the legislature to declare that the doing of certain forbidden acts shall render an election void is the exercise of its power to prescribe what shall amount to an election—a power clearly committed to it by the constitution. A governor, lieutenant governor, secretary of state, state treasurer, or attorney general cannot be elected at a void election any more than can a constable or coroner.

By sec. 7 of art. IV it is provided: "Each house shall be the judge of the elections, returns and qualifications of its own members;" thus committing jurisdiction to determine the validity of the election of a member of either house to that house. No similar provision respecting other officers is to be found in the constitution. The power to prescribe what constitutes a lawful election rests with the legislature, and in the absence of a provision of the constitution vesting the jurisdiction in some other branch of the government it is within the jurisdiction and power of the courts to determine in the manner provided by law whether or not an election of all other public officers has been held in accordance with the manner prescribed by law and to enforce the penalties and give effect to the law in accordance with its terms. By so doing it does not enter the political field but confines itself to the exercise of judicial power.[21]

In this case, however, the allegations relating to corrupt and illegal conduct in violation of the Corrupt Practices Act relate entirely to the primary election, which is held on the first Tuesday of September. (Act since amended.) If the respondent has title to his office he has it by virtue of the election held on the first Tuesday after the first Monday in

---

[21] *Attorney General ex rel. Bashford v. Barstow,* 4 Wis. 567, 659.

November. May the legislature declare the general election void by reason of misconduct of a candidate in the September primary? This is an interesting question and not without its difficulties. It may be stated this way: May the legislature provide that corrupt or illegal practices as defined by the act, committed at a primary, are so connected and related to the succeeding election as to render that election fraudulent and void? An effort to find an answer to this question requires us to consider the nature of an election. As already indicated, it is the process by which the political power in the state is exercised by those who are entitled to the suffrage under the constitution. This choice is made (a) by choosing candidates; (b) by passing upon measures and policies. At the time of the adoption of the constitution there were no primaries, no provision was made for the holding of caucuses or conventions. In the statute of 1849 (ch. 6) the entire statutory law upon the subject was embodied in two short sections:

"Sec. 28. Every elector shall vote by ballot, in the town or ward where he resides at the time of the election, and each person offering to vote shall deliver his ballot to one of the inspectors, in presence of the board; the ballot shall be a paper ticket, which shall contain, written or printed, or partly written and partly printed, the names of the persons for whom the elector intends to vote, and shall designate the office to which each person so named is intended by him to be chosen; but no ballot shall contain a greater number of names of persons designated to any office than there are persons to be chosen at the election to fill such office.

"Sec. 29. The names of all the persons voted for by any elector, at any general or special election, shall be on one ballot."

Whether or not a primary is a part of an election was considered by the supreme court of the United States.[22]

[22] *Newberry v. U. S.* 256 U. S. 232, 41 Sup. Ct. 469, 65 Lawy. Ed. 913.

Sec. 4 of art. I of the constitution of the United States provides:

"The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."

The question was whether under this provision of the constitution authority was conferred upon Congress to regulate primary elections. This was made to depend upon whether or not the word "elections" as used in the constitution was broad enough to include the primary, and it was held (Mr. Chief Justice WHITE and Mr. Justice PITNEY dissenting) that it did not and that therefore the federal Corrupt Practices Act so far as it attempted to limit expenditures at the primary was void. This case, however, must be limited by its facts. It relates to a delegation of power. Many weighty considerations of public policy no doubt moved the court to place a strict construction upon the language of the section. The court said:

"We cannot conclude that authority to control party primaries or conventions for designating candidates was bestowed on Congress by the grant of power to regulate the manner of holding elections. The fair intendment of the words does not extend so far; the framers of the constitution did not ascribe to them any such meaning. Nor is this control necessary in order to effectuate the power expressly granted. On the other hand, its exercise would interfere with purely domestic affairs of the state, and infringe upon liberties reserved to the people."

The *Newberry Case* was decided in 1921. In 1926 the supreme court of the United States had before it the case of *Nixon v. Herndon*.[23] The state of Texas enacted a statute which provided: "In no event shall a negro be eligible to

[23] 273 U. S. 536, 47 Sup. Ct. 446, 71 Lawy. Ed. 759.

participate in a Democratic party primary election held in the state of Texas." The question was whether or not this statute violated the Fourteenth and Fifteenth amendments. Plaintiff, who possessed all the necessary qualifications except that he was a negro, was denied the right to vote at a Democratic primary and brought suit against the election officials for damages. It was claimed that the action was political; that the plaintiff might lawfully be denied the right to vote in the primary, which was merely a method by which a party chooses its candidates. The court held that the question presented was not political and that the statute in question was void because in conflict with the Fourteenth amendment by reason of the fact that it discriminated against the plaintiff because of color alone. The question of whether or not a primary is a part of the election is not discussed, but the logic of the opinion would seem to be that it was such a part of the election process that denying the plaintiff the right to vote in a primary denied to him a right guaranteed to him by the Fourteenth amendment— the equal protection of the laws. This appears more clearly when considered in connection with the decision of the district court for the Western district of Texas which denied a plaintiff relief on the ground that a primary was no part of an election.[23a] While the question was not raised or discussed in the *Markham Cases,* the result announced in those cases can be arrived at logically only by assuming that the primary is a part of the election. When parties are recognized by the laws of a state and given a status in the law, party activities are thereby drawn within the field of regulation. As a matter of fact, the convention and caucus system and the primary election system are mere extensions

[23a] *Chandler v. Neff,* 298 Fed. 514. For further development in the controversy see *Nixon v. Condon,* 34 Fed. (2d) 464. See, also, for a valuable collection of cases, 43 Harvard Law Rev. 467.

of that which was originally included under the title *Elections*.[24] Elections are the means by which choices are made by the electors. When the process of choosing begins the election has been begun. Originally so far as the law was concerned it was supposed to begin and end on election day. Then the law extended it by taking notice of caucuses and conventions. Later it substituted the primary for the caucus and convention. While the process has been extended it still is one thing—the making of a choice. This unity is indicated by the fact that the law requires that with a nomination paper there shall be filed by the proposed candidate a declaration that if nominated and elected he will qualify.[25]

Where, as in many states, the securing of a nomination is equivalent to an election, to hold that a primary is a separate election and not a part of the election process would render the enforcement of corrupt and illegal practices acts, if not impossible, at least from a practical standpoint it would make them well-nigh so. Where a candidate procures his nomination by illegal means, that illegality attends his candidacy throughout the election process and vitiates the result. All the activities of the electorate from the time the primary begins until the result of the valid election is declared are one thing—the exercise of the political power vested in the electorate by the constitution.

There are strong considerations which may be urged against this view. It has been argued that political parties are voluntary organizations; that they have the right to control membership in the organization and to determine for themselves who shall and who shall not be the candidate of the party at any particular election. These objections were urged in cases involving the validity of primary elec-

[24] For a collection of cases, see *Line v. Waite* (154 Mich. 329, 117 N. W. 730) 18 L. R. A. n. s. 412, note, also 43 Harvard Law Rev. 467.

[25] Sec. 5.05, sub. (5) (b).

tion laws but almost uniformly overruled. But in those states having a primary election law similar to that in this state, and as to the validity of which there is no doubt, political parties are deprived of that privilege, and if they seek to have names of their candidates placed upon the ballot they must conform to the regulations in respect thereto, and the failure of a party to so conform prevents its candidates from being placed upon the official ballot under the party designation.[26] The validity of such laws has long since been established, not only in this state but generally throughout the English-speaking world. The precise question under consideration here has not been dealt with so far as we are able to ascertain. The cases already referred to cite all the authority that we have been able to find upon this question, both pro and con. It is considered that the legislature has power to declare the general election void as to a candidate who procured his nomination by means forbidden by the statute.

Broad as the power of the legislature is with respect to regulation of elections, that power is not wholly without limitation. Under the guise of regulating elections the legislature may not deprive a citizen of the right of trial by jury.[27] A person charged with its violation may not be compelled to give evidence against himself.[28] If it destroys the right of free speech it is to that extent void.[29]

The respondent urges that the act is an unreasonable restraint upon the right of free speech and a denial of due process of law and of the equal protection of the laws. Inasmuch as there is no discrimination between persons, any

[26] State ex rel. McGrael v. Phelps, 144 Wis. 1, 128 N. W. 1041; State ex rel. Bentley v. Hall, 178 Wis. 172, 190 N. W. 457.

[27] State ex rel. Schumacher v. Markham, 160 Wis. 431, 152 N. W. 161.

[28] State ex rel. Schumacher v. Markham, 162 Wis. 55, 155 N. W. 917.

[29] State v. Pierce, 163 Wis. 615, 158 N. W. 696.

qualified citizen having the right to become a candidate for any office and all persons who are candidates for any office being subjected to the same restraints, we see no ground upon which an argument can be based that the act operates as a denial of due process of law or of the equal protection of the laws. Does it operate as an unreasonable restriction upon the right of a citizen to address effectively his fellow citizens upon public questions? To answer this question we must examine the act and cognate laws in order to see what it is intended to do; what is permitted and what is prohibited.

By the primary election law [30] persons desiring to be candidates at the primary election must file nomination papers not later than the last Tuesday of July of the year in which the primary is held. No nomination paper may be circulated more than sixty days prior to the date on which it is required to be filed. There are then one hundred two days between the first day on which nomination papers may be circulated and the day on which the primary is to be held.[31] Sec. 12.01 provides that an act (disbursement) shall be deemed to have been done for political purposes when the act is of a nature and is done with the intent or is done in such a way as to influence or tend to influence, directly or indirectly, voting at any election or primary, etc. Disbursement is defined to include every act by or through which any money, property, office or position, or other thing of value passes or is directly or indirectly conveyed, given, provided, paid, expended, promised, pledged, contributed or lent; and also any money, property, office or position, or other thing of value so given, provided, paid, expended, promised, pledged, contributed or lent. It includes the act of disbursing and the thing disbursed. The term *candidate* includes every person for whom it is contemplated or desired that votes may be cast at any

[30] Sec. 5.05.
[31] Law amended, ch. 112, Laws 1929.

election or primary and who either tacitly or expressly consents to be so considered, etc. No candidate shall make any disbursements for political purposes except those provided by sec. 12.06 (*ante*). No party committee nor personal campaign committee shall make any disbursements except those provided in sec. 12.07 (*ante*). A candidate may but is not required to select a personal campaign committee. As applied to the primary election it is the quite evident purpose of the statute to limit the amount of money which may be disbursed by or on behalf of a candidate for office during the period he is a candidate, which ordinarily will commence with the time that nomination papers are first circulated and end with the holding of the primary. It is possible, of course, for a person to become an avowed candidate and subject himself to the restrictions contained in the act by announcing himself as a candidate and doing those things which are ordinarily done by candidates, such as seeking personal support and endeavoring to excite political activity on his behalf prior to the time when nomination papers may be circulated. The act does not make clear the period to which the limitation applies. Therefore a reasonable construction must be placed upon it. It is not to be supposed that it was intended by the act to restrict public discussion of questions relating to matters of public policy even by persons who contemplate being candidates unless and until they become such.[32] That one was an avowed candidate would no doubt be inferred much more easily from circumstances after the time nomination papers may be circulated than prior thereto. In the act, particularly that part relating to the amount which may be spent and the filing of accounts, the phrase "by and on his behalf" is used. There is no difficulty in understanding what is meant by the term *by;* the phrase "on his behalf," when it refers to a candidate,

---

[32] *State v. Bates,* 102 Minn. 104, 112 N. W. 1026, 12 Ann. Cas. 105 and note.

means by some one who acts for him in the sense that an agent acts for and on behalf of his principal. The authority may be express or implied but it must exist; otherwise the disbursement is not made on behalf of the person sought to be charged. Even after a person has announced or declared himself a candidate for a public office the statute makes no limitation upon the disbursements made by citizens who may upon their own initiative and on their own behalf support the candidacy of any person of their choice. Such voluntary support may be given by an individual or by a group of individuals. Persons so engaging in political activities are required to make no account thereof unless and until the total exceeds $50.[33] The making of addresses by citizens upon public questions, the exposition of matters relating to public policy, circulation of pamphlets, writing of letters, or discussing in other proper ways questions relating to public affairs which do not have for their immediate objective the promotion of the candidacy of a particular person, cannot be said to be done for political purposes as that term is defined in the act. Any discussion of public questions may at some future time be considered by an elector when deciding upon the candidate he will support, but that fact standing alone does not bring it within the definition of political purposes. The legislature has not sought to restrict discussion except that which may be carried on "by or on behalf of" a candidate, and in that case only by limiting his disbursements. The only restraint upon others is that imposed by sec. 12.09 (5) (a), relating to publicity.[34]

[33] Secs. 12.09 (5) (a) and 12.11.

[34] For an interesting case dealing with power to limit, see *State ex rel. Ragan v. Junkin*, 85 Neb. 1, 122 N. W. 473, 23 L. R. A. n. s. 839. In this case the court had under consideration an act which prohibited candidates for educational and judicial offices from being "nominated, indorsed, recommended, censured, criticised or referred to in any manner by any political party, or any political convention or primary, or at any primary election;" the court held

If the act operates as an unreasonable restraint upon the right of free speech or upon the right of a citizen to address his fellow citizens on questions of public policy, it must be because of restrictions imposed upon the candidate during the period of the election process. His rights in all other respects are unaffected by the act. If a candidate has a just cause which appeals to the conscience of his fellow citizens, it need not be without effective advocacy in every hamlet in the state and it may receive organized support other than that of a personal campaign or party committee.

What public interest is or may be served by such a restriction? It is a matter of common knowledge that men of limited financial resources aspire to public office. It is equally well known that successful candidacy often requires them to put themselves under obligation to those who contribute financial support. If such a candidate is successful, these obligations may be carried over so that they color and sometimes control official action. The evident purpose of the act is to free the candidate from the temptation to accept support on such terms and to place candidates during this period upon a basis of equality so far as their personal ambitions are concerned, permitting them, however, to make an appeal on behalf of the principles for which they stand, so that such support as may voluntarily be tendered to the candidacy of a person will be a support of principles rather than a personal claim upon the candidate's consideration should he be elected.

It may be asked in what way is a restriction which prevents a candidate from soliciting and receiving funds to be used in legitimate ways germane to the purposes of the act? It may be replied that the act seeks to throw democracy back

the act to be an unconstitutional invasion of the right of free speech and free assembly. *Ex parte Harrison,* 212 Mo. 88, 110 S. W. 709, 16 L. R. A. N. s. 950.

upon itself and so induce spontaneous political action in place of that which is produced by powerful political and group organizations. Political parties are convenient instrumentalities used in ascertaining the popular will. They are neither perfect nor indispensable. Their superiority is not so completely demonstrated as to preclude modification or experimentation with other methods.[35] Under the law a candidate from the beginning to the end, and, if elected, during his term of office, is committed to the principles which he enunciated rather than to the control of the group which elected him. The political theory which underlies this law may or may not be sound. It certainly cannot be said to be unreasonable.

It is urged that the sum of $4,000 [36] is so inadequate for the purpose of conducting a primary election campaign by a candidate and his personal campaign committee as to be an unreasonable restriction upon the right of the candidate to address effectively his fellow citizens upon behalf of the principles for which he stands. The right of free speech [37] and its cognate right, the right of free assembly,[38] are rights guaranteed to the citizens of this state by our constitution. These rights like all other constitutional rights are subject to reasonable regulation.[39]

In this connection a brief survey of the mechanics of a primary election will disclose the magnitude of the problem

[35] Ostrogorski, Democracy and the Organization of Political Parties, vol. II, ch. XII, p. 599 *et seq.*

[36] Sec. 12.20.

[37] "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press." Art. I, sec. 3.

[38] "The right of the people peaceably to assemble, to consult for the common good, and to petition the government, or any department thereof, shall never be abridged." Art. I, sec. 4.

[39] *State ex rel. Van Alstine v. Frear,* 142 Wis. 320, 336, 125 N. W. 961. For discussion, nature, and extent of right of free speech, see *Gitlow v. People,* 268 U. S. 652, 45 Sup. Ct. 625, 29 Yale Law Jour. 410, 30 Yale Law Jour. 48, 14 Ill. Law Rev. 539.

which confronts a candidate for state office at the primary election. This state has a population of three million; there are about 1,500,000 electors. There are 2,768 election precincts; there are 1,281 towns, 151 cities, 366 villages, and 71 counties. The state has an area of 54,450 square miles. From Kenosha near the southeast corner to Superior in the northwest corner by automobile road is a distance of 474 miles; from Marinette in the northeast to Platteville in the southwest, it is 271 miles. There are over 450 newspapers in the state. During the year 1929 there were 798,000 automobile, truck, and motorcycle licenses issued. There are 7,250 school districts. Amounts which may be expended for purposes declared to be proper by the statute are indicated by the following computations: It is generally reckoned that the expense of securing list of names, addressing envelopes, including necessary postage and clerical hire, is five cents per letter. If a candidate wrote a letter to each elector it would cost him $75,000; if he wrote a letter to each automobile registrant it would cost him $39,000. At the last primary election there were 512,065 votes cast in the Republican primary. If each one of these persons was sent a letter, it would cost more than $25,000. If a candidate should hold a meeting in each town, village, and city at an average cost for hall rent, speakers, lights, janitor service, and advertising of $10, it would cost $17,980. If he wished to hold a meeting in each one of the school districts of the state, at an average cost of $5, it would cost $36,250. A single insertion of a quarter-page advertisement in each of the papers of the thirty-three members of the Wisconsin Daily Newspaper League would cost approximately $950. In addition to such expenses the candidate might under the statute distribute lithographs, pamphlets, pay for bill-board advertisements, the insertion of his name on theatre programs, and employ the telephone, telegraph, and radio, and so bring his candidacy and the principles for which he stood before the electorate. No one supposes, of

course, that any candidate would do all of these things or even any considerable part of them. These considerations merely indicate the extent to which solicitation of the electorate may proceed if an appeal were made to every elector.

Neither the candidate nor his personal campaign committee can make disbursements for any other purposes than those specified in the act. Treating, the making of presents, and disbursements for other purposes constitute violations of the act. The limitation of $4,000 in the disbursements made for political purposes by a candidate for governor at the primary applies only to the candidate and his personal campaign committee. He is not chargeable with nor required to report disbursements for political purposes made by others unless they are authorized by him.

The law contemplates that individuals or groups may voluntarily upon their own initiative make disbursements for political purposes. It assumes that the publicity provided for by the act will operate as a sufficient restraint upon third persons; that when information and argumentation are divorced from the personal fortunes of the candidates, the electorate will be wise and discriminating enough to distinguish between the true and the false, the good and the bad, the sound and the unsound. Any other assumption would contradict the fundamental concepts which underlie the democratic ideal in government. It assumes that the purpose rather than the amount determines whether or not money spent in political contests is corrupting.

The question here presented is, Is the amount fixed by the act an unreasonable amount considering the fact that it may be disbursed in ways which do not tend to corruption?

It is a matter of common knowledge that democracies act in groups under the inspiration and direction of leaders. Whether or not some other method would be better is beside the question, for experience in these matters running back to the dawn of history shows that they have thus acted, and the strong probabilities are that they will so continue to act

during any foreseeable time. Political ideas may germinate in the hearts and minds of those composing the great mass of people; they come to their fruition, however, when leaders give them concrete form. These leaders are accepted by the people in the hope that the abilities and training acquired in other fields will transfer to a great extent into the governmental field and the general welfare be promoted thereby. Democracy advances in the main by a process of accretion, but occasionally great leaders arise having a mystical insight into the purposes, hopes, and aspirations of the people, such as Cromwell, Jefferson, or Lincoln, and democracy goes forward by great leaps and bounds supported by the franchises of a free people. A full exercise of the right of citizenship includes not only the right to vote but the right to assemble, right of free speech, the right to present one's views to one's own fellow citizens, and the right to submit one's claims to leadership to the people. These rights are of the very essence of democracy. When a citizen declares himself to be a candidate for public office he does not forfeit these rights. He is in the interest of the public welfare, however, in the exercise of these rights, subject to restraint by reasonable regulation.

In a number of cases in this court it has been made as plain as it is possible to make it that the regulation of these rights is subject to constitutional limitations, and if unreasonable must be declared void.[40] Laws of this kind lie with-

---

[40] *State ex rel. Runge v. Anderson,* 100 Wis. 523, 537, 76 N. W. 482: "We must appreciate the fact that without wise and careful legislative regulations, supplementing the constitutional guaranties, the elective franchise might be so abused, and the means of such corruption, as not only to nullify its controlling purpose, but every purpose of popular constitutional government. That extremists may carry such regulations too far is by no means improbable, but when they do it will be met by that other safeguard, the court, without which constitutional guaranties might easily be evaded and rendered useless by the ingenuity of legislatures." *State ex rel. Van Alstine v. Frear,* 142 Wis. 320, 125 N. W. 961; *State ex rel. Melms v. Young,* 172 Wis. 197, 178 N. W. 481.

in the police-power field and are subject to the same constitutional limitations as are laws dealing with the right to life, liberty, and property. The right of the legislature to exercise the police power is not referable to any single provision of the constitution. It inheres in and springs from the nature of our institutions, and so the limitations upon it are those which spring from the same source as well as those expressly set out in the constitution.[41] The legislature at all times exercises a delegated power and its action is always subject to the test of reasonableness. The sovereign power remains in the people.[42] A review of all the cases in which courts have considered the reasonableness of laws enacted by legislatures in the exercise of the police power would leave us about where we began.

A clear distinction must be drawn between cases passing upon the reasonableness of an act of the legislature and cases having to do with the reasonableness of municipal ordinances, the reasonableness of classifications, etc. The fundamental principles governing the exercise of the police power by the legislature have been considered many times by this court.[43] A court may not declare a law void for unreasonableness because it is unwise or prescribes a limitation more restrictive than the court thinks proper. If a law is germane to the subject with which it deals, that is, is not passed for the purpose of securing some ulterior objective and is in fact within the field of regulation; if it tends to conserve rather than destroy, it is beyond the scope of judicial interference.

There is no yard-stick by which reasonableness may be measured with mathematical certainty. This court holds in

---

[41] *Mehlos v. Milwaukee,* 156 Wis. 591, 599, 146 N. W. 882.

[42] *State ex rel. Bashford v. Barstow,* 4 Wis. 567, 769.

[43] *Priewe v. Wis. State Land & Imp. Co.* 103 Wis. 537, 79 N. W. 780 (drainage of lake); *State v. Redmon,* 134 Wis. 89, 114 N. W. 137 (upper berth regulation); *Bonnett v. Vallier,* 136 Wis. 193, 116 N. W. 885 (tenement-house regulation); *Trading Stamp Cases,* 166 Wis. 613, 166 N. W. 54.

accordance with the great weight of authority that a law cannot be held to be invalid because unreasonable unless and until it appears beyond reasonable controversy that it unnecessarily impairs to the point of practical destruction a right safeguarded by the constitution. As has already been pointed out, the law under consideration lies within the police-power field and impairs only the right of free speech, which includes the right to write and publish one's views. Does a law which applies only to a candidate and those who act under his direction and on his behalf and limits his disbursements to $4,000 in a primary election campaign, leaving the right of a candidate at all other times unrestricted, leaving the right of all other persons to address the electorate on their own initiative in behalf of the principles advocated by the candidate unimpaired, so unreasonably invade the constitutional right of a candidate as to be void? In order to entitle the court to declare the law void on that ground it is not sufficient that the restriction is greater or less than the court might think wise. It is not sufficient that it may appear to the court that it may operate as a restraint upon the information and education of the electorate. The court cannot determine what in its opinion is a proper amount and determine the reasonableness or unreasonableness of the act of the legislature by comparing it with that amount as a standard. Before the act can be set aside it must appear beyond reasonable controversy to the court that the law in question tends to destroy rather than conserve and is not germane to the purpose sought to be achieved.

The law being admittedly within the field in which the legislature may properly and constitutionally exercise the police power, the act does not so clearly appear to be an unwarrantable interference with the guaranteed constitutional right that it is within the power of the court to declare it void; on the contrary, the restriction, everything considered, is within the field of reasonableness. Reason-

ableness being largely a matter of opinion, it is helpful to note the limit prescribed in other states and by Congress. Under the federal statute the necessary personal and traveling expenses of the candidate, stationery, postage, printing, distribution of letters, circulars and posters, telephone and telegraph are not to be considered a part of the $5,000 which a senator may expend for his nomination and election. The exemptions are not the same in the various states, a fact which must be considered in making comparisons. In many states the amount which a candidate may expend for nomination is based on an amount per thousand of voters. The amount therefore varies with the years and comparisons are difficult. The following approximations are for nomination: Michigan $2,000, Minnesota $7,000 (includes election), Ohio $5,000 (includes election), Kansas $500, Massachusetts $5,000, Florida $4,000, Colorado $2,500, Arkansas $5,000, Louisiana $6,000, New York $10,000 (includes election), Kentucky $10,000, New Jersey $50,000.[44] It must be held that chapter 12 is a valid enactment.

If the amount which may be expended by a candidate for purposes designated as proper by the statute is so small as to prevent a proper appeal to the electorate, the remedy lies with the legislature and is in the field of political not judicial action. The balancing of detriments and benefits is for the legislature, not for the courts. A democracy is much less likely to be entangled in a web of its own weaving than it is to be led into error by the activities of those who may seek to use the power of government in furtherance of private as opposed to public ends. We do not say nor intimate that the respondent in this case has or had any such purpose. The question we are considering here arises upon the allegations of the complaint, which in our consideration

[44] See Sikes, Corrupt Practices Legislation, p. 284 *et seq.*

of the case we must take as true and admitted by the demurrer. We have not considered and do not consider this case with reference to the acts of any individual, our duty being to determine whether if the act be violated it is within the constitutional power of the legislature to declare the ensuing election void.

So far as it is humanly possible we have brought to the solution of these problems such legal skill and learning as we possess unbiased and uninfluenced by personal, party, or group consideration of any kind. It is our duty under our oaths to support the constitution and administer justice without respect to persons, and this duty we have endeavored to discharge with a full realization of the responsibility which rests upon us. If the opinion seems longer than necessary, we plead in justification the constitutional admonition that the blessings of a free government can only be maintained by a firm adherence to justice, moderation, temperance, frugality, and virtue, and frequent recurrence to fundamental principles.[45]

*By the Court.*—The order appealed from is reversed, and the cause remanded with directions to overrule the demurrer and for further proceedings according to law.

FOWLER and FRITZ, JJ., took no part.

[45] Art. I, sec. 22.