450 P.2d 106

Robert F. TELLEZ, Petitioner,

v.

The SUPERIOR COURT of the State of Arizona, IN AND FOR the COUNTY OF PIMA, and the Honorable Jack G. Marks, Judge of the Superior Court, Division 8, and the Pima County Board of Supervisors, a body politic, and Thomas Jay, Dennis Weaver, and Pete Rubi, as members of the Board of Supervisors, and Wesley Bolin, Secretary of State of the State of Arizona, and Bill Dumes, Respondents.

No. 9419.

Supreme Court of Arizona.
In Banc.
Feb. 5, 1969.

George B. Morse, Tucson, for petitioner.

Gary K. Nelson, Atty. Gen., Carl Waag, Asst. Atty. Gen., for respondent Secretary of State.

William J. Schafer, III, Pima County Atty., Rose Silver, Sp. Deputy to Pima County Atty., Tucson, for respondent Jack G. Marks, Judge of Superior Court of Pima County.

Robert N. Hillock, Tucson, for respondent Pima County Bd. of Supervisors.

Lawrence D'Antonio, Tucson, for respondent Bill Dumes.

McFARLAND, Justice.

This matter came before this Court on a writ of certiorari filed by Robert F. Tellez, petitioner, asking that we review the order of the Honorable Jack Marks, dated Sept. 20, 1968, in which he ordered, adjudged and decreed that a writ of mandamus be forthwith issued by the Clerk of the Superior Court of Pima County directing the Board of Supervisors to issue a certificate of nomination to Bill Dumes and to place his name on the ballot at the general election. This Court, after due consideration of the record and the matters presented by the petitioner and respondents at the hearing, entered a peremptory writ of mandamus, with a decision to follow, the pertinent part of which is:

"NOW, THEREFORE, YOU, HONORABLE JACK G. MARKS, Judge of the Superior Court of Pima County, Arizona, are hereby commanded to set aside the judgment entered in Pima County, Superior Court cause number 109553, entitled BILL DUMES, Petitioner, v. BOARD OF SUPERVISORS FOR THE COUNTY OF PIMA, STATE OF ARIZONA, et al; quash the Writ of Mandamus issued by Judge Jack G. Marks on September 25, 1968, in the Superior Court of Pima County, Arizona, in said action.

"It is further ordered and commanded that the Board of Supervisors of Pima County recall and cancel the certificate heretofore issued on September 23, 1968, to BILL DUMES as the Democratic candidate nominated at the primary election held September 10, 1968, in Pima County.

"The Board of Supervisors is further ordered and directed that should a designee as candidate for such office be selected by the Democratic Party of Pima County, pursuant to Sec. 16-604, A.R.S. 1956, then such designee shall be certified as the Democratic candidate for said office, and the Board of Supervisors shall cause said person's name to be printed on the General Election ballot in the space provided for the Democratic candidate for the office of Treasurer of Pima County, Arizona."

The peremptory writ of mandamus was based upon the following facts: Prior to August 22, 1968, ballots for the use of qualified electors registered as affiliated with the Democratic Party and eligible to vote in the primary election to be held on September 10, 1968, had been distributed and used, which included candidates for the office of County Treasurer of Pima County, Arizona. The ballots contained the names of Carroll H. Christian, Thomas G. Dorgan and Bill Dumes for the nomination of the office of County Treasurer of Pima County, Arizona. On August 22, 1968, Carroll H. Christian, the then duly elected incumbent Treasurer of Pima County, Arizona, died. At the election, the votes cast for the Democratic Party candidates for the office of Treasurer of Pima County were as follows: Carroll H. Christian 8,087; Bill Dumes 7,864; Thomas G. Dorgan 7,511; Robert F. Tellez 5,209. The votes cast for Robert F. Tellez were by way of write-ins. Thereafter Bill Dumes filed a petition in the Superior Court of the State of Arizona in and for the County of Pima for a writ of mandamus to compel the issuance of a certificate of nomination to place his name upon the official ballot in the ensuing general election.

The trial court, after a hearing and the entering of findings of fact and conclusions of law, entered an order for the issuance of a writ of mandamus as prayed for by the petitioner Bill Dumes.

■ The question presented to this Court is whether Bill Dumes received the highest number of votes within the meaning of the Constitution of the State of Arizona, Article 7, § 7, A.R.S.:

"In all elections held, by the people, in this State, the person, or persons, receiving the highest number of legal votes shall be declared elected."

It was the contention of Bill Dumes that, Carroll Christian having been deceased before the election, the votes for him should not be counted and that Bill Dumes having received the next highest vote should be declared nominated.

There are two theories in regard to votes cast for a deceased. One is known as the English Rule. It takes the view that votes cast for a deceased, disqualified or ineligible person are to be treated as void and thrown away and are not to be counted in determining the results of the election. This, however, is dependent upon whether the electors before the election receive due notice that the candidate is deceased or disqualified. The lower court evidently followed this rule as it set forth in its finding of facts a detailed account of newspaper articles, television and radio broadcasts of the death of Carroll Christian and stated that they were "to the extent that the death of Carroll H. Christian, while serving as Treasurer of Pima County, Arizona, presumably would have been generally known to the qualified electors of the Democratic Party in the said primary election." Also, a finding that Carroll H. Christian who had died prior to the primary election was not a person within the meaning of the provision of the Constitution.

■ The general rule which we think the better is that the votes cast for a deceased, disqualified or ineligible person are not to be treated as void or thrown away but must be counted in determining the result of an election as regards to other candidates where such deceased or disqualified person received the highest number of votes. The courts have held that the result of its application is to render the election nugatory and to prevent the election of the person receiving the next highest number of votes. Corpus Juris Secundum states the majority rule to be as follows:

"Votes cast for a deceased, disqualified, or ineligible person, although ineffective to elect such person to office, are not to be treated as void or thrown away but are to be counted in determining the result of the election as regards the other candidates." 29 C.J.S. Elections § 243, p. 676.

In the case of Ingersoll v. Lamb, 75 Nev. 1, 333 P.2d 982, Robert J. Ingersoll and·

Lester V. Smith were candidates for the office of county assessor at an election held on November 4, 1958, and Smith died on October 21, 1958. His death received wide publicity. The question was whether the petitioner, Ingersoll, had been elected.

"Petitioner and Lester V. Smith were candidates for such office at the general election held November 4, 1958. Smith died October 21, 1958 while he was serving as sheriff and ex-officio assessor. His death received wide publicity and most, if not all, electors voting at said general election had knowledge of his death. Smith received 1,489 votes and petitioner 1,161.

"No constitutional or statutory provision explicitly governs the situation, nor does any prior decision of this court direct the solution. The decisions of the courts of other jurisdictions are diametrically opposed, each asserting its views in positive and uncompromising language. Under such guidance as is afforded by our constitution and laws and our theories of popular government, and under authority of those cases which we think follow the better and more logical rule (as well, it would seem, as the majority rule), we have concluded that petitioner, not having received the highest number of votes cast, is not entitled to receive a certificate of election.

\* \* \* \* \* \*

" \* \* \* In a comprehensive annotation in 133 A.L.R. 319, 321, we read: 'The general rule—that votes cast for a deceased, disqualified, or ineligible person are not to be treated as void or thrown away, but are to be counted in determining the result of the election as regards the other candidates—has been most frequently applied in cases where the highest number of votes were cast for the deceased or disqualified person. The result of its application in such cases is to render the election nugatory, and to prevent the election of the person receiving the next highest number of votes. The rule has been applied, or recognized as applicable, under such circumstances, in the following cases:' This is followed by citations to cases from 28

states, Puerto Rico, England, Australia and Canada. We find no better reason for the general rule than that stated by the Supreme Court of California in 1859, in Saunders v. Haynes, 13 Cal. 145, extensively cited, and referred to in 7 Calif. Law Review 64 as stating that the rule is 'well established.' 'An election is the deliberate choice of a majority or plurality of the electoral body. This is evidenced by the votes of the electors. But if a majority of those voting, by mistake of law or fact, happen to cast their votes upon an ineligible candidate, it by no means follows that the next to him on the poll should receive the office. If this be so, a candidate might be elected who received only a small portion of the votes and who never could have been elected at all but for this mistake. The votes are not less legal votes because given to a person in whose behalf they cannot be counted; and the person who is the next to him on the list of candidates does not receive a plurality of votes because his competitor was ineligible. The votes cast for the latter, it is true, cannot be counted for him; but that is no reason why they should, in effect, be counted for the former, who, possibly, could never have received them. It is fairer, more just, and more consistent with the theory of our institutions to hold the votes so cast as merely ineffectual for the purpose of an election, than to give them the effect of disappointing the popular will, and electing to office a man whose pretensions the people had designed to reject.'

"The same kind of reasoning was used in State ex rel. Herget v. Walsh, 7 Mo. App. 142, where the court asked: 'If the voter can make his vote effective only by voting in a certain way, and if the result of his voting in this way is to secure a new election at which the majority can elect, how can it be assumed that the voter intended to throw away his vote?' The court later adds, ' \* \* \* and it is only by a fiction, raised, if at all, by the law, that the majority in such cases throw their votes away.' A like philosophy is expounded in Derringe v. Donovan, 308 Pa. 469, 162 A.

439, 441, which logically shows that a contrary rule would be 'repugnant to the principle of majority rule, which is the cornerstone of orderly government.' Contrary to the rule stated in Dunagan v. Jones, Tex. Civ.App., 1935, 76 S.W.2d 219, 222, that where a vote is cast for a candidate known to be dead the effect is 'a deliberate intent to waste it' and a 'wanton' misapplication of it, it was said in Sanders v. Rice, 41 R.I. 127, 102 A. 914, L.R.A.1918C, 1153, that votes so cast were not in such willful defiance of law as to be thrown away but could be counted in support of a showing that the opposing candidate had not received a majority. This, in short, is the application of what has come to be known as 'the American rule,' which we adopt as opposed to what is known as 'the English rule,' Annotation 133 A.L.R. 319, 340, followed by a number of the American courts.

"Petition denied." 333 P.2d at 983, 984.

The following cases follow the majority rule: Clark v. Porter, 223 Ark. 682, 268 S.W.2d 383; People ex rel. Rosenberg v. Keating, 112 Colo. 26, 144 P.2d 992; Thompson v. Stone, 205 Ga. 243, 53 S.E. 2d 458; Bogie v. Hill, 286 Ky. 732, 151 S.W.2d 765; Payne v. Gentry, 149 La. 707, 90 So. 104; Mansur v. Morris, 355 Mo. 424, 196 S.W.2d 287; Woll v. Jensen, 36 N.D. 250, 162 N.W. 403; Ingersoll v. Lamb, supra; In re Primary Election Held in Lackawanna County, 345 Pa. 228, 27 A.2d 189; Blackwood v. Hollingsworth, 195 Tenn. 427, 260 S.W.2d 164; State ex rel. Schmidt v. White, 257 Wis. 560, 44 N.W. 2d 523; State ex rel. La Follette v. Kohler, 200 Wis. 518, 228 N.W. 895, 69 A.L.R. 348. See also annotations 133 A.L.R. 319.

In accordance with the majority rule we hold that Bill Dumes was not nominated to the office of Treasurer of Pima County.

The next question is the effect of A.R.S. § 16–604, as amended, which reads as follows:

"A vacancy occurring due to death, mental incapacity or voluntary withdrawal of a candidate after a primary election may be filled by the political party committee of the state, county, city or town as the case may be, by filing the name of the candidate to fill such vacancy with the officer with whom nomination petitions are filed at any time before the official ballots are printed."

While this section does not state when the death must have occurred to result in a vacancy, there can be little doubt that in the instant case Carroll Christian's death was the cause of the vacancy in the nomination on the Democratic ticket for county treasurer. We read the words "after a primary election" to apply only to the words "voluntary withdrawal of a candidate." It is our opinion that it was the intent of the legislature to provide means of filling such vacancies regardless of whether the death occurred before or after the election. We therefore hold that the Democratic Party of Pima County had the right to designate the Party's nominee to be placed on the ballot.

The writ of mandamus heretofore issued by this Court is made permanent.

UDALL, C. J., LOCKWOOD, V. C. J., and STRUCKMEYER and HAYS, JJ., concur.