982 P.2d 274

Renz JENNINGS, Commissioner, Arizona Corporation Commission, Petitioner.

v.

J. Grant WOODS, Attorney General, State of Arizona, Respondent,

Tony West, Arizona Corporation Commissioner Elect, Real Party in Interest.

No. CV–98–0586–SA.

Supreme Court of Arizona, En Banc.

June 9, 1999.

**316**

Anthony B. Ching Phoenix, Attorney for Petitioner.

Janet A. Napolitano, Attorney General, by Thomas I. McClory, Assistant Attorney General, Thomas J. Dennis, Assistant Attorney General, Phoenix, Attorneys for Respondent.

Irvine Van Riper, P.A., by Thomas K. Irvine Ellen M. Van Riper, Phoenix, Attorneys for Real Party in Interest.

Snell & Wilmer, by Steven M. Wheeler, Martha E. Gibbs, Jeffrey B. Guldner, Phoenix, Attorneys for Amicus Curiae Arizona Public Service.

## OPINION

JONES, Vice Chief Justice.

¶ 1 This action challenges the eligibility of Tony West to be elected to the office of Commissioner of the Arizona Corporation Commission in the November 3, 1998 general election. The action was filed originally as a Special Action Petition for Writ of Mandamus against the attorney general. Pursuant to petitioner's separate application filed subsequently, we treat the matter as a statutory action in *quo warranto*.

¶ 2 We hold Mr. West ineligible by reason of the express language of A.R.S. § 40–101: "A person in the employ of, or holding an official relation to a corporation or person subject to regulation by the commission ... shall not be elected ... to ... the office of commissioner." [1]

¶ 3 As used in the statute, the word "person" must be construed to include natural persons, and the phrase "person in the employ of, or holding an official relation to a corporation or person subject to regulation," includes natural persons registered as securities salespersons with the corporation commission. At the time of the election, West was a registered securities salesperson licensed to a registered securities dealer. Both West and the dealer were subject to regulation by the commission. Under the plain language of the statute, he was not eligible to be elected.

¶ 4 The principle which governs our opinion is fundamental and lies at the core of representative government. Our three corporation commissioners are representatives of the people, elected to office with specific constitutional and statutory duties. They must be free of conflicts both at the point of election and during tenure in office. The purpose of section 40–101 is to promote ethics in government and avoid conflicts of interest. Our duty is to interpret and apply the statute in order to effectuate that purpose. Public confidence in government officers is vital. Section 40–101 provides clear legisla-

---

1. The full text of section 40–101 provides:

    A person in the employ of, or holding an official relation to a corporation or person subject to regulation by the commission, or a person owning stocks or bonds of a corporation subject to regulation, or a person who is pecuniarily interested therein, shall not be elected, appointed to, or hold the office of commissioner or be appointed or employed by the commis-

    sion. If a commissioner, or appointee or employee of the commission becomes the owner of such stocks or bonds, or becomes pecuniarily interested in such a corporation involuntarily, he shall within a reasonable time divest himself of such stocks, bonds or interest. If he fails to do so, he thereby vacates his office or employment.

tive direction in the resolution of this case and permits no other result.

¶5 By reason of today's decision, West must relinquish the office to the incumbent commissioner, Renz Jennings, until a replacement is appointed by the Governor in accordance with procedures established by article V, section 8 and article XXII, section 13 of the Arizona Constitution.

¶6 The court's jurisdiction exists pursuant to Ariz. Const. art. 6, § 5(1), (4). *See State ex rel. Sawyer v. LaSota,* 119 Ariz. 253, 254, 580 P.2d 714, 715 (1978) (the Supreme Court's original jurisdiction over *quo warranto* actions directed at state officers has existed since statehood); *State ex rel. Smith v. Bohannan,* 101 Ariz. 520, 521, 421 P.2d 877, 878 (1966).[2]

## I. Factual and Procedural Background

¶7 West defeated Paul Newman in the general election to replace outgoing Commissioner Jennings.[3] The Secretary of State issued West a certificate of election on November 23, 1998. On December 3, 1998, news reports revealed that West, during the course of the campaign and throughout the election process, held registered status with the corporation commission as a securities salesperson under the securities laws of Arizona. As required by law, he was licensed to a registered securities dealer. West surrendered his registration, i.e., his "license,"[4] to the commission December 4, 1998, one month after the election.

¶8 On December 9, 1998, Newman wrote a letter to then Attorney General Grant Woods relying on the prohibition against

election pursuant to section 40–101, and requesting that Woods advise the Secretary of State that West was ineligible to take the oath of office in a ceremony scheduled to take place January 4, 1999. Newman asserted that section 40–101 explicitly prohibits election to the corporation commission of any person holding an active securities license issued by the commission. Newman and West's counsel subsequently sent letters to the attorney general's office arguing their respective views on the interpretation and application of section 40–101. On December 18, 1998, by letter, the attorney general declined Newman's request.

¶9 Meanwhile, on December 16, 1998, Jennings requested, pursuant to A.R.S. § 41–193(A)(7), that the attorney general issue an opinion regarding the proper interpretation of section 40–101 in order to determine whether he must continue to hold office or simply hand over the seat to West upon administration of the oath. On December 22, 1998, the attorney general responded to Jennings' request by attaching a copy of the December 18 letter sent to Newman.

¶10 On December 24, 1998, Jennings filed a "Special Action Petition for Writ of Mandamus" in this court, seeking to force the attorney general to issue an opinion interpreting section 40–101 before West took the oath of office. We granted West permission to intervene as the real party in interest.

¶11 On December 30, 1998, West responded, claiming the *mandamus* action was in reality an election contest that was barred by the limitations provision of A.R.S. § 16–673(A) which allows five days from certifica-

---

2. The court accepted original jurisdiction of this action because of the need for expedited resolution of an issue of statewide significance. The petition **could have** been sent first to the superior court, but to require a case involving solely an issue of law, arising in the context of a popular election, to work its way initially through the lower courts before coming here would have resulted in inordinate delay. The matter eventually would have been brought here in any event where it must ultimately be decided.

3. The attorney general's office reports that West received 479,530 votes, compared to Newman's 476,258 votes.

4. Both parties, in their briefs and various other papers filed with the court, use the term "license" to describe West's securities sales and marketing privilege granted by the corporation commission. On at least one occasion, Jennings' counsel describes West as a "registered" salesman of securities. Similarly, the statute defines West as a "registered salesman." A.R.S. § 44–1801(17). For purposes of the court's analysis, the terms "license" and "registration" are viewed as synonymous. The "notice of registration" issued by the commission to salespersons pursuant to A.R.S. § 44–1946(B) is the equivalent of a license. In order to remain consistent with the arguments of counsel, we use the "license" terminology.

tion of the canvass—November 23, 1998 in West's case—to challenge an election result based on a candidate's eligibility to hold office. Further, West argued that section 40–101 applied only to public service corporations and their employees. Under such a narrow interpretation section 40–101 would not apply to West or to any other securities salesperson or dealer. The attorney general did not respond to the special action petition before the January 4 administration of the oath.

¶ 12 On January 5, the day after West took the oath and officially began serving as a commissioner, Jennings filed a reply brief with this court. The reply countered West's assertion that the *mandamus* action was barred by the elections statute of limitations. It also urged this court to treat the case, initially styled in *mandamus*, as an action in *quo warranto* under A.R.S. § 12–2043[5] since West, by then, had assumed office.

¶ 13 On January 15, 1999, this court ordered that the *mandamus* action be treated as a petition in *quo warranto*. Supplemental briefs were filed by both Jennings and West. The attorney general's response to the petition reaffirmed its decision to decline a *quo warranto* action against West on behalf of the state. The court heard the oral arguments of counsel on February 22, 1999.

## II. Appropriateness of *Quo Warranto*

¶ 14 West asserts that Jennings' *quo warranto* claim must fail under section 12–2043 and is barred by the statute of limitations pertaining to elections challenges.

5. Section 12–2043 states:
A. If the attorney general or the county refuses to bring an action as provided for in §§ 12–2041 and 12–2042, upon information or **at the request of any person claiming such office or franchise, the person may apply to the court for leave to bring the action in his own name** and may so bring it if leave therefor is granted.
B. Notice of the application shall be given to the attorney general or the county attorney as the case may be.
(Emphasis added.)

6. Section 12–2041 states:
A. An action may be brought in the supreme court by the attorney general in the name of the state upon his relation, upon his own information or upon the verified complaint of any per-

¶ 15 The history of *quo warranto* is important. A.R.S. § 12–2041, dating to Arizona's Civil Code of 1913, is our *quo warranto* statute authorizing the attorney general to bring the action in the name of the state.[6] Like most American common law and statutory *quo warranto* provisions, section 12–2041 is derived from the English common law high prerogative writ of *quo warranto*. This extraordinary writ, literally translated as "by what authority" or "by what warrant," *see Black's Law Dictionary* 1256 (6th ed.1990), allowed only the king to bring a public proceeding to · correct the wrong caused by someone unlawfully holding or misusing the king's power. The theory of the writ was that all governmental privileges ultimately derived from the king. *See State ex rel. Hess v. Boehringer,* 16 Ariz. 48, 58, 141 P. 126, 130 (1914) (Franklin, C.J., dissenting). English common law briefly abandoned the writ in favor of an "information in the nature of *quo warranto*" brought by the king's attorney general, a purely criminal provision that resulted in ouster of the unauthorized office holder and criminal punishment. *See* 65 Am.Jur.2d *Quo Warranto* § 2 (1972). Later, the civil *quo warranto* writ was reinvigorated and dramatically expanded through passage of the Statute of Anne. *See id.; Boehringer,* 16 Ariz. at 59, 141 P. at 130.

¶ 16 Arizona's private *quo warranto* statute, section 12–2043, further expands the common law writ from its limited roots to allow "any person claiming such office" to force a determination of the rightful office holder between the claimant and the occupant.[7] *See Abbey v. Green,* 28 Ariz. 53, 74,

son, in cases where the supreme court has jurisdiction, or otherwise in the superior court of the county which has jurisdiction, against any person who usurps, intrudes into or unlawfully holds or exercises any public office or any franchise within the state.
B. The attorney general shall bring the action when he has reason to believe that any such office or franchise is being usurped, intruded into or unlawfully held or exercised.

7. Section 12–2043 was originally codified at Civ. Code § 1598 (1913) and was later codified at Rev.Code § 4407 (1928) and at Code § 28–303 (1939) before arriving at its current location. The relevant provisions, for purposes of our analysis, have remained unchanged during that time period.

235 P. 150, 157 (1925); *Boehringer*, 16 Ariz. at 60, 141 P. at 131 (Franklin, C.J., dissenting) (noting the legislature's power to extend or modify the common law writ of *quo warranto* ).

¶ 17  In *Skinner v. City of Phoenix*, 54 Ariz. 316, 95 P.2d 424 (1939), we held that an individual may use section 12–2043 "when he, himself, claims the office or franchise in question." *Id.* at 323, 95 P.2d at 427.  Further, "[t]he rule of law is well established . . . that a claimant to an office may have judgment only on the strength of his own title and not upon any infirmity or weakness in the defendant's title." *Tracy v. Dixon*, 119 Ariz. 165, 166, 579 P.2d 1388, 1389 (1978). *Tracy* emphasized that a *quo warranto* petitioner also must have a present right to the office. *See id.; see also Crouch v. City of Tucson*, 145 Ariz. 65, 67, 699 P.2d 1296, 1298 (App.1984) (a personal interest in the office has been deemed a condition precedent to maintenance of a *quo warranto* action); *Campbell v. Harris*, 131 Ariz. 109, 111, 638 P.2d 1355, 1357 (App.1981) ("[T]he right to maintain a *quo warranto* action is personal to the party claiming the office.  The claimant is the only person who can prosecute the action in his own name.").

¶ 18  The requirement that a private *quo warranto* petitioner must claim the office unlawfully held was defined in *State ex rel. Sullivan v. Moore*, 49 Ariz. 51, 64 P.2d 809 (1937), an early case in which we discussed the interaction between the elections statutes and the *quo warranto* provisions.  *Moore* involved a public *quo warranto* petition brought originally in this court by the attorney general seeking to oust two newly elected tax commissioners.  After discussing both the public and the private *quo warranto* actions and the differences between the two, this court rejected the commissioners' argument that an elections action was the exclusive means of challenging the tax commissioners' eligibility:

> Nor do we think that this is, in effect, an election contest.  Counsel, in raising this contention, overlook the fact that this action was not brought for the benefit of a private individual claiming an office, but in the interest of the state to protect it from having two of its important offices administered by those who have no right thereto.

*Id.* at 59, 64 P.2d at 813.

¶ 19  West argues the *Moore* language forecloses Jennings' private *quo warranto* action under section 12–2043, citing *Donaghey v. Attorney General*, 120 Ariz. 93, 95, 584 P.2d 557, 559 (1978), and *Hunsaker v. Deal*, 135 Ariz. 616, 617–18, 663 P.2d 608, 609–10 (App.1983).  But *Donaghey* merely disallowed an absentee voter's challenge to an election that incorporated the town of Superior, Arizona because the gravamen of the complaint was covered by the elections statutes, and *Hunsaker*, an action filed by a citizen contesting an election, reversed a trial court's determination that a board of supervisors candidate was ineligible to hold office because the action was brought beyond the five days allowed under the applicable elections statute.  We disagree with West's argument.  *Moore* succeeded as a public *quo warranto* proceeding, and *Donaghey* and *Hunsaker* were resolved under the elections statutes.  Neither *Donaghey* nor *Hunsaker* involved a *quo warranto* challenge by a private party under section 12–2043.  Though the writ was historically vested solely in the province of public officials, these cases, by reason of our expanded private *quo warranto* statute, do not foreclose Jennings' action.

¶ 20  We need only look to the practical consequences of West's argument to find support for our conclusion that Jennings has standing.  In *Tellez v. Superior Court*, 104 Ariz. 169, 450 P.2d 106 (1969), we adopted the prevailing general rule:

> [T]he votes cast for a deceased, disqualified or ineligible person are not to be treated as void or thrown away but must be counted in determining the result of an election as regards to other candidates where such deceased or disqualified person received the highest number of votes. . . . [T]he result of its application is to render the election nugatory and to prevent the election of the person receiving the next highest number of votes.

*Id.* at 171, 450 P.2d at 108 (citing 29 C.J.S. *Elections* § 243 (1965)).  *Tellez*, which we reaffirm, precludes West's opponent, New-

man, the second-place candidate, from bringing the action in *quo warranto.* Were we to hold that Jennings, too, is an improper petitioner, no private party could challenge West's eligibility. Indeed, no private party could ever bring a *quo warranto* challenge against a commissioner-elect whose ineligibility, as here, is not disclosed until after the limitations period in the elections statutes has expired. West's interpretation would render section 12–2043 meaningless because it would eliminate all *quo warranto* actions whenever the attorney general declines to sue on behalf of the state.

¶ 21 The existence of section 12–2043 suggests a more balanced result. This court's decisions appropriately define the scope of section 12–2043's plain language; they do not eviscerate it. Just as the *quo warranto* provisions cannot be allowed to render the elections statutes meaningless, so also must our interpretation ensure that the elections statutes do not render the *quo warranto* provisions meaningless.

■ ¶ 22 Adherence to settled principles of interpretation dictates that in cases in which an elected public officer is challenged on grounds of ineligibility, there will be at least one private individual who meets the qualifications of section 12–2043. If the incumbent is not available to claim the office or refuses to bring the action, *mandamus* then becomes the remaining source of relief whereby the citizens require the attorney general to bring *quo warranto. See LaSota,* 119 Ariz. at 255, 580 P.2d at 716.[8]

### III. Constitutional "Holdover" Requirements Authenticate Jennings' Claim to Office

■ ¶ 23 Jennings correctly asserts that should West be declared ineligible, the state constitution provides an affirmative duty for Jennings to remain in office until a qualified successor is appointed. Under Arizona's

holdover provision, article XXII, section 13 of the constitution, "[t]he term of office of every officer to be elected or appointed under this constitution or the laws of Arizona shall extend until his successor shall be elected and shall qualify." (Emphasis added.) Jennings claims title to the office as a matter of law through his letter dated December 31, 1998 to the deputy executive secretary of the corporation commission: "It is my intention to retire as of December 31, 1998, unless the Supreme Court [of Arizona] determines that the law requires me to hold over until my successor qualifies." (Emphasis added.) *See Crouch,* 145 Ariz. at 67, 699 P.2d at 1298; *Campbell,* 131 Ariz. at 111, 638 P.2d at 1357.

¶ 24 Jennings brings this action as the incumbent commissioner and claims the office "in his own name," in keeping with the express language of the statute. The attorney general declined to assert the claim, and Jennings expressly conditioned his retirement on the very circumstances that have arisen, i.e., the determination by the court in today's decision that he must hold over until a successor qualifies. He meets all constitutional and statutory requirements, and we therefore conclude he qualifies as a private *quo warranto* petitioner under section 12–2043 and the holdover provisions of the constitution. Ariz. Const. art. XXII, § 13.

¶ 25 Our conclusion that Jennings' *quo warranto* action is proper allows us to address a motion filed by the attorney general to be dismissed from this case. Because we find Jennings to be a proper *quo warranto* petitioner, we grant the attorney general's motion.

### IV. Interpretation of Section 40–101

#### A. Section 40–101's language—The Plain Meaning

¶ 26 Section 40–101 states, in relevant part:

> of the claim of ineligibility in that case, stating that because the attorney general cannot arbitrarily refuse to discharge his or her duties, "[a]n original petition addressed to this court will be given effect irrespective of its name." *LaSota,* 119 Ariz. at 255, 580 P.2d at 716. Jennings originally styled this action as a *mandamus* action directed at the attorney general.

8. Even had we accepted West's argument that Jennings was not a proper *quo warranto* challenger, we still may be compelled to address the argument that section 40–101 rendered West's election invalid. In *LaSota,* we determined, for reasons unrelated to this case, that a private-party *quo warranto* action under section 12–2043 was improper. However, we reached the merits

A person in the employ of, or holding an official relation to a corporation or person subject to regulation by the commission, or a person owning stocks or bonds of a corporation subject to regulation, or a person who is pecuniarily interested therein, **shall not be elected,** appointed **to,** or hold **the office of commissioner** or be appointed or employed by the commission.

(Emphasis added.)

¶ 27 The key phrase is "person in the employ of, or holding an official relation to a corporation or person subject to regulation," and the pivotal terms are "person," "regulation," and "elected." If any of these do not apply to West, then the prohibitions found in section 40–101 are also inapplicable. Conversely, if the key phrase and the pivotal terms all apply, West must be declared ineligible.

### 1. "Person"

■ ¶ 28 The word "person" as used in section 40–101 is susceptible of plain meaning interpretation. West's attempt to limit "person" to unincorporated associations is contradictory and creates confusion. The word "person" is used in the first sentence of section 40–101 four times: "a person in the employ of, or holding an official relation to a corporation or person subject to regulation by the commission;" "a person owning stocks or bonds of a corporation subject to regulation," and "a person who is pecuniarily interested therein." The statute then forbids such a "person" from being elected, being appointed to, or holding the office of commissioner. Clearly, the only "person" capable of being elected, appointed, or holding the office is a natural person, not an unincorporated association.

¶ 29 The legislative history of section 40–101 supports this interpretation. Although the current corporation commission statutes do not provide definitions of key terms, the original version of section 40–101 did. Sec-

tion 40–101 was originally codified in 1913 as Title IX, Chapter XI, section 2283. Another provision of Chapter XI was section 2278, which contained definitions of most of the operative terms and stated that "person," "when used in this chapter, includes an individual, a firm, and a copartnership." (Emphasis added.) Although the definitions were dropped in subsequent codifications of corporation commission provisions, nothing in the history of the statute suggests the meaning of "person" changed.

¶ 30 We conclude easily that "person" as used in section 40–101 includes natural persons. *See Knoell Bros. Constr., Inc. v. Department of Revenue,* 132 Ariz. 169, 171, 644 P.2d 905, 907 (App.1982), *abrogated on other grounds* by *Valencia Energy Co. v. Department of Revenue,* 191 Ariz. 565, 959 P.2d 1256 (1998) ("In statutory construction, it is a general rule that where the same words or phrases appear in the same statute, they will be given a generally accepted and consistent meaning unless the legislative intent is clearly expressed to the contrary.") (citing *Baker v. Salomon,* 31 Ill.App.3d 278, 334 N.E.2d 313, 316 (1975) and 82 C.J.S. *Statutes* § 366a (1953)); *see P.F. West, Inc. v. Superior Court,* 139 Ariz. 31, 34, 676 P.2d 665, 668 (App.1984) (interpreting the terms "person aggrieved" in a zoning statute consistently with the way that term was used in other zoning statutes). As to section 40–101, there is no expression of legislative intent to the contrary, and the plain meaning of the statute is clear that the term "person" includes natural persons.

### 2. "Person In the Employ Of, or Holding Official Relation To" a Licensed Securities Dealer

¶ 31 At the time of election, West was licensed to a registered securities dealer. As such, he was "in the employ of, or holding an official relation to a corporation or person" licensed by the commission to market and sell securities. *See* A.R.S. § 44–1946.[9]

9. A.R.S. § 44–1946, which deals with the "register" of securities dealers and salespersons, reads:

**Registration in register of dealers and salesmen of applicant complying with requirements**

A. If an applicant has fully complied with the provisions of this article and the rules of the commission thereunder the director shall register the applicant as a salesman in a register of dealers and salesmen, unless the commis-

¶ 32 Being thus licensed leaves no latitude under this provision of section 40–101 and places West squarely within the express definition as one holding an official relation. No one disputes West's licensee relationship or the other facts on which this conclusion is based.[10]

### 3. "Regulation"

¶ 33 Section 40–101 provides no specialized definition of the term "regulation." The dictionary defines the power to regulate as the power "[t]o fix, establish, or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws." *Black's Law Dictionary* 1286 (6th ed.1990). Webster describes the power to regulate as the power "to govern or direct according to rule"; "to bring under the control of law or constituted authority"; "to make regulations for or concerning"; "to bring order, method, or uniformity to"; or "to fix or adjust the time, amount, degree, or rate of." *Webster's Collegiate Dictionary* 985 (10th ed.1993).

¶ 34 Broad regulatory authority is exercised by the corporation commission over securities dealers and salespersons pursuant to A.R.S. §§ 44–1941 through 44–1949 and A.R.S. §§ 44–1961 through 44–1964. The commission thus has power to require all securities dealers and salespersons to register for securities licenses; to deny, revoke, or suspend such licenses; and to determine how a commission order denying, revoking, or suspending a license shall be entered and enforced. Hearing provisions referenced in A.R.S. § 44–1962 are found in A.R.S. §§ 44–1971 through 44–1974. All these provisions are designed to protect the public. *See In re Knoell*, 160 B.R. 825, 826 (D.Ariz.1993) (corporation commission's power to regulate the sale of securities exists to protect the public).

¶ 35 In addition, the commission wields authority over efforts by securities dealers and salespersons to market securities. Section 44–1821 grants the commission open-ended rule-making power to "carry out the provisions" of Arizona's Blue Sky laws. Section 44–1822 authorizes the commission to conduct public or private investigations inside or outside the state "to determine whether any person has violated or is about to violate any provisions" of Arizona's Blue Sky laws or of commission rules related to securities. It also allows the commission, "at any time either prior to or subsequent to the registration of any securities or any dealer or salesman, [to] investigate and examine into the affairs of any person . . . when the commission believes that such person is or may be issuing or dealing in or selling or buying securities."

¶ 36 After the commission begins an investigation, section 44–1823 allows commissioners to "subpoena witnesses, take evidence and require by subpoena duces tecum or by citation the production of books, papers, contracts, agreements or other documents, records or information, whether filed or kept in original form or electronically stored or recorded which the commission deems relevant or material to the inquiry."

¶ 37 Section 44–1898(D) requires securities license holders to prepare a prospectus which must be approved by the commission and must meet the requirements of section 44–1894. The prospectus must be given "to each purchaser of securities registered by qualification." Section 44–1991 contains Arizona's equivalent of the federal 10b-5 anti-fraud provisions and allows the commission to investigate any license holder's potentially fraudulent statements or activities. The commission may issue cease and desist orders to securities licensees pursuant to A.R.S. § 44–2032 on the appearance of a violation of our Blue Sky laws.

¶ 38 Section 44–2032 also authorizes the commission to "correct the conditions" of a licensee's violation "including, without limitation, a requirement to provide restitution as

sion finds cause for denial as provided for in article 10 of this chapter.

B. When the director has registered an applicant as a salesman he shall promptly notify the applicants of the registration by mail or by the CRD system.

10. The record indicates that West held his license until December 4 and that he was at all relevant times licensed to a registered securities dealer. *See* A.R.S. § 44–1945. By law, he was authorized to function as a licensed securities salesperson by reason of the relationship. *See id.*

prescribed by the rules of the commission." Additionally, section 44–2032 allows the commission to apply for an injunction in superior court, which can be issued permanently to halt a securities licensee's unlawful sales activities. Section 44–2036 authorizes the commission to conduct "administrative actions" that involve the conduct of securities licensees in violation of the statute, the result of which could be a civil fine up to $5,000 per violation.

¶ 39  Section 44–2040 is a catchall penalty that provides that any person, including licensees, can be found guilty of a class 1 misdemeanor for any violation of Arizona's Blue Sky laws and does not specify a penalty for its violation.

¶ 40  The complete regulatory scheme is found in A.R.S. §§ 44–1801 through 44–2055. *See State ex rel. Corbin v. Goodrich,* 151 Ariz. 118, 121, 726 P.2d 215, 218 (App.1986) ("[T]he commission has constitutional authority to regulate the sale of securities.") (emphasis added) (citing *State ex rel. Bullard v. Jones, see infra* ); *North Star Int'l v. Arizona Corp. Comm'n,* 720 F.2d 578, 582–83 (9th Cir.1983) (finding Arizona's merit review process for securities offerings a "more stringent" regulatory measure than federal securities laws which focus not on merit, but on disclosure).

¶ 41  These broad statutory powers within the securities industry constitute "regulation" in every sense of the word. We have previously so held. *See Goodrich,* 151 Ariz. at 121, 726 P.2d at 218. West's status as a salesperson licensed to a registered securities dealer pursuant to A.R.S. §§ 44–1946 through 44–1949 is relevant because the language of section 40–101 expressly designates persons in such official relationships as "subject to regulation" by the commission. To hold otherwise would require us to ignore the clear import of comprehensive securities regulations as cited and described, as well as the plain meaning of section 40–101.

---

**11.** The elections statutes are not clear whether a person is "elected" at the time of the vote or upon receiving the certificate of election. We need not address this question because West did not surrender his securities license until December 4, 1998, well after he had received his certifi-

### 4. "Elected"

¶ 42  The word "elected" and the prohibition against election first appeared in 1928 in an amendment to section 40–101. No specialized definition is given in the statute itself. Absent a statutory definition, we look to the ordinary meaning of the word. *See McIntyre v. Mohave County,* 127 Ariz. 317, 319, 620 P.2d 696, 698 (1980) (words and phrases in a statute should be given ordinary meaning unless the context dictates otherwise).

¶ 43  The law dictionary states "[t]he word 'elected' in its ordinary signification, carries with it the idea of a vote, generally popular, sometimes more restricted, and cannot be held the synonym of any other mode of filling a position." *Black's Law Dictionary* 517 (6th ed.1990). Webster defines an elected candidate as someone "chosen for office or position but not yet installed" or someone "select[ed] by vote for an office, position, or membership." *Webster's Collegiate Dictionary* 371 (10th ed.1993). These definitions are clear. *See State ex rel. Jones v. Lockhart,* 76 Ariz. 390, 398, 265 P.2d 447, 453 (1953) (determining that the word "elected" refers to the regular election process).[11]

¶ 44  West was a candidate for elective office while in possession of a securities license. Under any definition he was "elected" to the office of commissioner and was subject to the prohibition of section 40–101 on November 3, 1998. The statute applies to him.

### B.  *State ex rel. Bullard v. Jones*

¶ 45  West offers an interpretation of this court's 1914 decision in *State ex rel. Bullard v. Jones,* 15 Ariz. 215, 137 P. 544, that the prohibitions of section 40–101 are applicable solely to public service corporations and have no application to other "regulated" entities, notably securities dealers and salespersons. We view the argument as unsound, and reject it because it contradicts the

cate of election. We are fully satisfied that "election" is not synonymous with the administration of the oath. This latter function is separate and its purpose is simply to place the mantle of responsibility on the person previously elected to the office.

plainly expressed intent of section 40–101 and misinterprets *Jones*.

¶ 46 *Jones* dealt with section 7 of Chapter 90, Laws of 1912 (the earliest precursor of section 40–101). Attorney General Bullard brought an action in *quo warranto* against Jones, one of the first commissioners of the Arizona Corporation Commission. Bullard asserted that Jones' ownership of capital stock in a California corporation whose sole assets were two Arizona insurance companies, violated the prohibition against a commissioner being "pecuniarily interested" in any corporation subject to commission regulation.

¶ 47 Our 1914 analysis in *Jones* focused exclusively on the narrow question whether the commission's authority to regulate under section 7 extended to persons owning shares of stock in insurance companies. Jones argued that the "pecuniarily interested" prohibition did not apply to ownership in Arizona insurance corporations. We held, for reasons explained below, that the penalty provisions of section 7 could not be applied to Jones.

¶ 48 Three factors controlled *Jones'* conclusion not to apply the "pecuniarily interested" provision. First, Jones had purchased and was the owner of his insurance stock and had taken office as a commissioner before insurance companies were placed under the commission's regulatory umbrella, i.e., before section 7 could be applied. *See id.* at 226, 137 P. at 548–49. The *Jones* court was understandably concerned about the potential inequity of ousting someone from office because of a law that became applicable after he was installed.

¶ 49 The court referenced the statute's effective date in relation to Jones' earlier acquisition of insurance stock no less than three times. *See Jones*, 15 Ariz. at 218, 227, 228, 137 P. at 545, 549 ("[O]n or about February 18, 1911, [Jones] became the owner … of 50 shares of the capital stock of the Merchants' and Insurers' Reporting Company and ever since has been and now is such owner of said 50 shares"; "Not until October 1, 1913, were insurance companies 'subject to regulation in whole or in part' by the Corporation Commission"; "Since October 1, 1913, the date that chapter 94 became effective, it is shown by the complaint that defendant Jones had owned stock in an insurance company subject to regulation by the Corporation Commission.") (emphasis added). These explicit statements were obviously critical to *Jones'* reasoning.

¶ 50 The second factor is equally important. The insurance statutes, notably chapter 94, Laws of 1913, contained a separate conflict of interest provision addressed exclusively to equity ownership in insurance companies, allowing ownership only as a policyholder. In contrast, the *Jones* court believed section 7's "pecuniarily interested" prohibition would have prohibited even policy ownership. *See id.* at 227–28, 137 P. at 549. The court resolved the conflict between section 7 and the later-enacted insurance laws by recognizing that the legislature had enacted the more specifically targeted insurance conflict of interest provision found in chapter 94, thus restraining the operation of section 7's penalty. *See id.* at 228, 137 P. at 549. Otherwise, section 7 would have applied from the moment the legislature placed the extensive insurance regulations under the corporation commission regulatory umbrella. Although Jones' stock ownership was in violation of chapter 94's conflict provisions, no penalty for this violation was specified under chapter 94 and the simple divestiture penalty in section 7 did not apply because of the more specific insurance prohibition and because Jones acquired his stock before section 7 was enacted. *See id.*

¶ 51 Indeed, in *Jones* we stated with utmost care that "the penalty prescribed in section 7 … does not apply." *Jones*, 15 Ariz. at 228, 137 P. at 549 (emphasis added). At no point did we state that section 7 as a whole was inapplicable. *Jones* had already stated that the insurance statute (chapter 94) made section 7 applicable to a commissioner's ownership of insurance stock. *Id.* at 227, 137 P. at 549. That is precisely why *Jones* refers to the insurance conflict provision as a "very significant provision." *Id.*

¶ 52 Third, the court was concerned with the results that would flow by applying the "pecuniarily interested" prohibition to Jones.

The dissent argues that the 1913 legislature enacted insurance-specific conflict of interest provisions in chapter 94 because it knew that section 7 did not apply. Yet the exact opposite is true—the court believed the legislature placed specific insurance conflict provisions in chapter 94 because it knew that section 7 did apply and even went so far as to prevent commissioner ownership of insurance policies. The court characterized this as an "absurd result" that accorded with "neither rime nor reason." *Id.* at 228, 137 P. at 549. Interestingly, the dissent argues that if the 1913 legislature believed that section 7 otherwise applied, all it had to do was to expressly allow commissioners to own insurance policies. Indeed, that is precisely what the legislature did when it enacted chapter 94's conflict provision to permit such ownership.

¶ 53 These three factors explain *Jones.* The court emphasized that its opinion was based on the factors and not on a legal conclusion that section 7 applied only to public service corporations. *See id.* at 227, 228, 137 P. at 549 ("[S]ection 7 of chapter 90 has no application to the state of facts in this case"; "The legislature evidently took the view that section 7 of chapter 90 had no application to a state of facts as here appear.") (emphasis added).

¶ 54 In addition, two further aspects of *Jones* cannot be reconciled with West's argument that section 40–101 applies exclusively to public service corporations. First, in discussing various constitutional and statutory provisions, the court addressed the commission's powers found in the constitution at article XIV, section 16. Importantly, as noted, the insurance provisions, passed in aid of section 16, were not enacted until after Jones purchased his insurance stock. Because of this, in language wholly ignored by the dissent, *Jones* explicitly rejects the argument that section 7 applied uniquely to public service corporations:

> **Not until October 1, 1913** [when chapter 94, Laws of 1913, took effect and well after Jones had already purchased his insurance stock] **were insurance companies 'subject to regulation in whole or in part' by the Corporation Commission,** and not until then was there any inhibition against a

commissioner owning stock or bonds, or being pecuniarily interested in, or in the employ of or holding an official relation to, an insurance corporation.

*Jones,* 15 Ariz. at 227, 137 P. at 549 (emphasis added).

¶ 55 This passage, importantly, applies the very language of section 7 to insurance companies and states with absolute clarity that the insurance statute (chapter 94) fell within its scope. The *Jones* court could never have so stated were it establishing a rule of law that section 7 should be limited solely to public service corporations. Insurance corporations are not, and never have been, public service corporations.

¶ 56 Second, the alleged public service corporation limitation cannot explain the overall mode of analysis employed by the court in *Jones.* The dissent quotes language from *Jones* dealing with public service corporations and asserts "[t]his is the holding of the *Jones* case." *See* Dissent at ¶ 96–98. Yet the court did not end its analysis at that point. Rather, of its five pages devoted to analysis of the section 7 issue, a full three pages following the "holding" are focused on constitutional and statutory provisions as they relate to corporations that are clearly not public service corporations. As a telling example, the court discusses four statutes that implement the "visitorial and inquisitorial" powers of article XIV, section 16. The statutes addressed commission authority over (a) home co-operating companies (chapter 48, Laws of 1912), (b) surety companies (chapter 50, Laws of 1912), (c) investment companies (chapter 69, Laws of 1912), and (d) insurance companies (chapter 94, Laws of 1913). Since *Jones* involved ownership of insurance stock, the insurance provisions (chapter 94) were discussed at length, eventually concluding, as indicated, that these regulations would have required application of section 7 to Jones, but for the timing of his purchase (prior to enactment) and but for the insurance-specific conflict provisions built into the statute.

¶ 57 Had *Jones* truly concluded that section 7 was limited exclusively and permanently to public service corporations, it would not have been necessary to canvass these consti-

tutional and statutory mandates. The restriction to public service corporations urged in the case at bar renders the last three pages of *Jones*—the bulk of the section 7 analysis—meaningless. There was no reason to discuss provisions unrelated to public service corporations to explain that section 7 is limited to such corporations. The court could easily have dealt with these provisions in a sentence had it restricted section 7 to apply exclusively to public service corporations. Addressing section 7 at the end of the opinion, the court was careful to state that only the "penalty prescribed" in section 7 was not applicable to the facts of the case. 15 Ariz. at 228, 137 P. at 549.

¶ 58    We recognize that certain language in *Jones*, viewed in isolation, discusses public service corporations as regulated entities to which section 7 applied. However, our interpretation gives meaning and is faithful to all of *Jones*. The case at bar is distinguishable, and *Jones* can have no impact on Jennings' claim now before us. At most, *Jones* was an analysis of the corporation commission's authority over insurance companies and individuals connected with them. It did not deal with regulated securities dealers or their licensees as we do today.

¶ 59    Given *Jones'* fact-driven analysis, we underscore the fundamental differences between Jennings' claim before us and the claim brought by Bullard against Jones. First, no insurance statute gave the corporation commission regulatory authority over insurance companies before Jones purchased his stock, whereas extensive securities regulations in support of Jennings' claim have been vested in the commission since statehood; those regulations went from substantial in 1912 to all-encompassing in 1951. Second, the insurance statutes of 1913 contained their own separate conflict of interest provision that factored as "very significant" in the *Jones* decision, 15 Ariz. at 227, 137 P. at 549,

whereas in the case at bar, the securities regulation statutes have never provided an independent conflict of interest clause that can be similarly read as an affirmative signal allowing West to escape section 40–101's application. Third, *Jones*, sensibly, sought to avoid the "absurd result" of a decision that would forbid corporation commissioners from owning insurance policies, whereas here, there is nothing absurd about requiring the holder of an active securities license to relinquish the license and thus eliminate built-in conflicts even before pursuing the office.

¶ 60    Let it be clear that we do not overrule *Jones* by today's decision. We have examined it and noted only its inapplicability to Jennings' claim against West. Because we are not overruling *Jones*, we are not applying new law. The election prohibition of section 40–101 has existed since 1928, and the commission has regulated the securities industry since 1912, with expansive regulatory additions made in 1951. This statutory scheme is regulatory as to West. West's ignorance of the law or mistaken interpretation of it does not excuse him from its application.[12]

¶ 61    No case in the history of Arizona jurisprudence has ever held or implied that the prohibition, "shall not be elected," added to the statute in 1928, should apply exclusively to persons interested in public service corporations. The fact the commission's panoply of securities regulatory powers increased dramatically in 1951 is also a factor we cannot ignore.

¶ 62    We do not believe West's overly narrow interpretation of *Jones* should overturn the plain meaning of today's statute, whose provisions deal not merely with "pecuniary interest," but also, since the 1928 amendment, deal in unrestricted terms with the eligibility of any person in official relation to a regulated entity to be elected commissioner. Nothing in section 40–101 suggests or even remotely intimates it is to be confined

---

12.    *See Nussbaumer v. Superior Court,* 107 Ariz. 504, 507, 489 P.2d 843, 846 (1971) ("Where the complaining party has access to all the facts surrounding the questioned transaction and merely makes a mistake as to the legal consequences of his act, equity should normally not interfere, especially where the rights of third parties might be prejudiced thereby."); *Mackey*

*v. Philzona Petroleum Co.,* 93 Ariz. 87, 92, 378 P.2d 906, 909 (1963) (ignorance of rescission right was not sufficient to invalidate assignment to creditors: "That plaintiffs were ignorant of the legal consequences of their act is immaterial. Ignorance will not prevent conduct from amounting to an election of a right.").

to the narrow public utility arena, and *Jones,* read properly, does not establish such limit.[13]

¶ 63   Nor does internal commission policy alter our conclusion. West asserts that the corporation commission interprets A.R.S. § 40–101 as being limited to public service corporations. On the contrary, internal commission policy does not state that section 40–101 is necessarily exclusive in its application to public service corporations. A 1989 memorandum from the commission's executive secretary states that "[a] copy of the Arizona law (ARS § 40–101) which expressly prohibits employees and spouses from owning stocks or bonds in a public service corporation (utility) regulated by the commission has been added to the package [of commission orientation materials]." Memorandum from James Matthews of July 6, 1989. The memo does not offer information on the specific question which we address, whether section 40–101 shall be applied as well to the activities of securities dealers and securities salespersons.

■  ¶ 64   Further, any reliance on commission policy is puzzling because the commission's interpretation of a statute can be given no effect by this court. *See Trico Elec. Coop. v. Ralston,* 67 Ariz. 358, 363, 196 P.2d 470, 473 (1948) ("No judicial power is vested in or can be exercised by the corporation commission unless that power is expressly granted by the constitution.").

### C.   The Purpose of the Section 40–101 Prohibitions—The Avoidance of Conflicts

¶ 65   Just as *Jones* sought to avoid absurd results, we assess whether application of the statute to West creates an untenable result or otherwise fails to "effect the object" of section 40–101 and "promote justice." *Mendelsohn v. Superior Court,* 76 Ariz. 163, 169, 261 P.2d 983, 987–88 (1953); *see also State v. Superior Court,* 113 Ariz. 248, 249, 550 P.2d 626, 627 (1976) (considering the "effects and

consequences, and the spirit and purpose of the law").

¶ 66   Although no legislative history explicitly states the purpose of the statute's prohibition against the election of persons holding official relation to regulated entities, we think the purpose is obvious. Being elected vests a commissioner with sweeping authority over a substantial field of business activity in Arizona, whether in public utilities or in the securities industry. There is ample reason why both types of business are regulated. Both have significant impact on the public at large, so much so in the securities industry that an enormous federal agency, the Securities and Exchange Commission, was established by the Congress to regulate the massive interstate aspects of securities marketing and sales.

¶ 67   West's interpretation of section 40–101, that he is not in official relation to a regulated entity, would allow him to retain his license, use it, and still function as a commissioner. Such interpretation is not rational and would encourage serious conflicts of interest. *See Bohannan,* 101 Ariz. at 522, 421 P.2d at 879 ("It is, we believe, accepted without dissent that public officers must have no personal interest in transactions with the government which they represent.").

¶ 68   Perhaps most importantly, if West were permitted to hold office and contemporaneously maintain a securities license, great damage to our securities marketing systems would become apparent. Persons such as West could hold securities licenses, be fully engaged in marketing securities under authority of their own licenses, and still sit in judgment as regulators of the state's securities industry. We do not believe the legislature ever intended such consequence, either now or in 1912 when section 7 was first enacted. Indeed, if West should be allowed to serve, there would be nothing in the law prohibiting all three commissioners, during tenure, from holding and using active securities licenses to promote their own interests,

---

**13.**   The dissent concedes that Arizona's Blue Sky laws constitute "regulation," but then dismisses its own conclusion with the following nonsequitur: "[Securities] *regulation is quite ordinary* and could have been vested by the legislature in some other branch of government." Dissent at

¶ 129.   This is surely true, but the legislature also could have provided no section 40–101 conflict of interest provisions at all, hoping that self-interest alone would provide sufficient guidance. The point is not what it could have done, but what it did.

while at the same time regulating the securities industry to the disadvantage of their competitors. Recusal by a commissioner would be necessary only in a case involving the licensee's own securities company. This raises the specter of enormous conflicts.

¶ 69 Both parties before us agree that the "official relation" language of section 40–101 forbids the election of an officer or employee of a public service corporation to a seat on the corporation commission. Yet West urges a contrary rule under the same language that would allow a securities licensee to be elected and to sit without ever relinquishing his or her license. This is disturbing. To permit a securities person to be elected and at the same time prohibit the election of a public utility officer demonstrates with abundant clarity the dichotomy advocated by West and the strange and discordant result it would produce. No explanation is offered, save West's interpretation of *Jones*, as to why securities persons should be eligible and public utility persons should not. We conclude there is no basis for any such distinction, either in *Jones* or in the statute.

¶ 70 Moreover, even if West were to recuse on a case involving his own or his employer's license in order to avoid the obvious conflict, only two commissioners would remain, leaving the commission paralyzed in matters in which the two were not in agreement. The suggestion that party litigants can free themselves from a paralyzed commission by going to the superior court, etc., is impractical, unduly burdensome, and clearly not contemplated by the legislature as a solution to a problem as pervasive as this one. To allow a commission candidate to be elected and to serve while continuing to hold a license is a recipe for the very conflicts which section 40–101 was designed to prevent.

¶ 71 Additionally, it is argued that the general conflict of interest provisions of A.R.S. § 38–503 alone suffice. But *Jones* did not say this. West himself did not argue this. No one at Arizona's constitutional convention said this. Instead, the dissent simply creates and embraces this conclusion on its own, suggesting that the ordinary conflict of interest provisions of A.R.S. § 38–503 are adequate. We believe this is a policy conclusion better left to the legislature. We cannot replace the legislature's expressed intent in section 40–101 with our own views of what would be "adequate" to rein in conflicts of interest.[14]

¶ 72 An analogy is urged that because the justices of this court are licensed as lawyers and yet regulate the practice of law, West, similarly, should be allowed to sit as a commissioner, continue to hold and actively use his securities license, and at the same time regulate the securities industry. The analogy fails because judges of courts are legally prohibited from engaging in the practice of law, whether or not there is a conflict. *See* Ariz. Const. art. VI, § 28. Judges are licensed lawyers because the law requires them to be licensed. *See* Ariz. Const. art. VI, § 6. Judges must sever all ties with lawyers and law firms because the court regulates all licensed members of the bar.[15] Commissioners, on the other hand, according to West's own argument, would be permitted to regulate the securities industry and contemporaneously use their licenses to market

**14.** Review of the constitutional debates in the dissenting opinion serves no purpose. Here, again, is a search for support where it is lacking—an attempt to show that those at the convention intended to limit section 7 to public service corporations. Yet nowhere in the debates is such an assertion found. There is support only for the notion that Arizona's founding lawmakers determined that public service corporations would be constitutionally regulated, whereas other activity would be regulated by statute. This obviously does not address the critical question, whether statutes, such as the Blue Sky laws, would be deemed "regulation" within the scope of section 40–101. The dissent suggests that F.A. Jones and two members of this court, who were convention delegates, would have said "no." Yet, by the time the court decided *Jones* in 1914 these same two explicitly concluded that insurance statutes also constituted "regulation" that set section 7 in motion. *See Jones*, 15 Ariz. at 227, 137 P. at 549.

**15.** Importantly, section 28 requires a judge to forfeit his or her judicial office upon filing nomination papers for election to a nonjudicial position, a provision remarkably similar in operation to our application of section 40–101 to West in this case.

securities. Requiring that every judge be licensed as a lawyer is by no means the functional equivalent of a corporation commissioner holding a license that would authorize him or her to sell securities while in office. Yet that is precisely what the dissent and West advocate.

¶ 73 Nor does an analogy to the Board of Medical Examiners (BOMEX) survive scrutiny. For reasons that are self-evident, A.R.S. § 32–1402 mandates that nine of twelve BOMEX members "shall be actively practicing medicine." For equally obvious reasons, no law requires that a corporation commissioner possess a securities license.

¶ 74 Further, it is inaccurate to speculate that our analysis will probably render the other two commissioners ineligible as "pecuniarily interested persons" because they may be stockholders in certain Arizona corporations. Nothing in this opinion would prevent a corporation commissioner from owning shares of stock or other investments in any Arizona corporation whose contact with the commission is essentially limited to the initial filing of articles of incorporation, the payment of an annual fee, and the submission of annual reports. We have stated that this activity does not constitute regulation under existing law. *See Jones,* 15 Ariz. at 226, 137 P. at 549.

¶ 75 Though the pecuniary interest component of section 40–101 is not before the court, and thus not relevant to the issue we decide, it is argued that a person owning a securities brokerage account with a licensed securities dealer, including an individual retirement account, is a person with a pecuniary interest in the securities firm itself. The term "pecuniary interest" equates with an equity or ownership interest in an entity regulated by the commission.

¶ 76 The dissent presents a "sky is falling" scenario under which candidates for the corporation commission would be ineligible for election if they have money in a securities account from which investments are made, including investments in corporate stock, mutual funds or in a money market fund. These and similar speculations are incorrect and based on unnecessary conjecture. We do not interpret the statute's pro-

hibition of "pecuniary interest" or "official relation" in a regulated entity as including deposits of money that create a debtor-creditor relationship or establishment of a brokerage account that permits the broker to invest the client's funds in various entities. The statute is not violated so long as the investments are made in entities, including money market funds, not regulated by the Arizona Corporation Commission. In short, one may be a customer of a brokerage house without being pecuniarily interested in that business. There is a difference between "doing business with" and "being in business with" a regulated corporation.

### D. Physical Placement of Section 40–101 in Chapter 1, Article 1 of Title 40

¶ 77 West urges that the limited application of section 40–101 to public service corporations finds support from its physical location in title 40 of the statutes, labeled "Public Utilities and Carriers." To accept this argument would require us to place enormous weight on the simplistic contention that titles and physical location of a statute within the code should govern our decision. While it is true section 40–101, in its 1913 form, was placed in a chapter devoted in substantial part to public service corporations, it has since been tossed from place to place in the Arizona Revised Statutes like a sailboat in a monsoon.

¶ 78 Section 7 of chapter 90 was codified in 1913 as title IX ("Corporations"), chapter 11 ("Public Service Corporations and Corporation Commission"), section 2283 (untitled). Section 2283 became the actual code provision that embodied section 7. In 1928, section 2283, section 40–101's predecessor, was moved to section 666 ("Qualifications of Commissioners and Employees"), chapter 15 ("Corporation Commission and the Regulation of Public Service Corporations"), Part II ("General Laws"). In 1939, section 666 was codified as section 53–102 ("Qualifications of Commissioners and Employees"), part of chapter 53 ("Corporations and Societies"), Article I ("Corporation Commission").

¶ 79   Currently, section 40–101 is part of title 40 ("Public Utilities and Carriers"), but we note particularly that chapter 1, article 1, with section 40–101 as the lead provision, contrary to West's assertion, is titled "Corporation Commission—In General" and has general application to the full scope of commission activity, which, of course, goes well beyond public service corporations.

¶ 80   We view West's argument as unpersuasive and impractical, given the current breadth of section 40–101 in relation to the commission's power to regulate the securities industry and the unsettled journey which section 40–101 has taken since 1912. Interestingly, if West's restrictive interpretation of title 40 were accepted, based on physical placement in the code, it would also mean the commission could hold no meetings (section 40–102), never use a commission seal (section 40–103), never have a commission executive secretary (section 40–105), and commission personnel could not be compensated (sections 40–108 and 40–109), except when a public service corporation is involved. This result would be unacceptable as a matter of law and is obviously inconsistent with the commission's current practice.

### V.   Penalty for Violating Section 40–101

¶ 81   West argues that any violation was cured when he surrendered his securities license December 4, 1998. The language of section 40–101 calls for application of the canon of statutory interpretation *expressio unius est exclusio alterius* ("[T]he expression of one thing is the exclusion of another."). *See Southwestern Iron & Steel Indus., Inc. v. State*, 123 Ariz. 78, 79, 597 P.2d 981, 982 (1979); *Roller Village, Inc. v. Superior Court*, 154 Ariz. 195, 199, 741 P.2d 328, 332 (App.1987). The first sentence of section 40–101 prohibits appointment or election of regulated persons. The silence found in the second sentence speaks loudly. That sentence states only that any commission employee subject to the prohibitions of the first sentence who "involuntarily" becomes "pecuniarily interested" in a prohibited entity, "shall within a reasonable time divest himself of such stocks, bonds or interest. If he fails

to do so, he thereby vacates his office or employment."

¶ 82   Nowhere does the second sentence state an individual who violates the election prohibition can similarly cure the defect once in office. The simple statutory mandate of 1928 says "shall not be elected." We read this as a matter of express legislative intent that the conflict of interest provisions of section 40–101 required West to surrender his license before the election, not after; post-election surrender cannot validate an election for which he was otherwise ineligible as a matter of law. To hold otherwise would render the 1928 mandate superfluous.

¶ 83   West's argument is quite similar to the one raised after the Nogales mayoral election in *State v. Macias*, 162 Ariz. 316, 783 P.2d 255 (App.1989). Arizona constitutional and statutory provisions at the time *Macias* was decided mandated that all mayoral candidates were required to live within city boundaries for at least fifty days prior to the election.[16] In *Macias*, the victorious mayor had moved just outside the city's boundaries years before her election; she argued that the violation was cured when she moved within Nogales' boundaries after the election. The court reasoned:

> Were we to accept defendant's argument, anyone in Arizona or elsewhere would be free to run for the office of Mayor of Nogales so long as he or she established residence after the election in time to be a qualified elector before the term of office began. Such political carpetbagging is precluded by the constitutional provision. The statute allowing officials to hold over until their successors qualify is designed to prevent vacancies in office not to allow the unqualified to qualify.

*Id.* at 319, 783 P.2d at 258. *See also Nicol v. Superior Court*, 106 Ariz. 208, 211, 473 P.2d 455, 458 (1970) (holding that the age, citizenship, and qualified elector requirements of the office of attorney general **must be fixed at the time of the general election**); *Bohannan*, 101 Ariz. at 524–25, 421 P.2d at 881–82 (qualifications for election must be met **both before and during public service**).

**16.**   A.R.S. § 9–822 now requires residency for      only 29 days before the election.

¶ 84 We are aware that the prescribed penalty in section 40–101 forces us to upset the results of a popular election by establishing Jennings as the holdover commissioner still in office, a course of action upon which we embark reluctantly. *See Donaghey*, 120 Ariz. at 95, 584 P.2d at 559 (noting a strong public policy favoring stability and finality of public elections); *Moore*, 49 Ariz. at 71, 64 P.2d at 817 ("[I]t is always the purpose of the court to give effect to an election where this can be legally done, and we regret exceedingly that ... the court cannot do so in this instance."). On the other hand, our reluctance to remove West from office is tempered by four factors—first, that West was ineligible for election, second, that Jennings was popularly elected, third, Jennings serves only temporarily as a reinstated incumbent, *see Tellez*, 104 Ariz. at 171, 450 P.2d at 108, and fourth, the Governor has the power and duty to appoint a qualified successor.[17]

### VI. Jennings' Temporary Reinstatement Does Not Violate Term Limits

¶ 85 Our conclusion that Jennings is a successful *quo warranto* challenger does not violate term limits imposed on Jennings by the Arizona Constitution. *See* Ariz. Const. art. XV, § 1 ("No member of the Corporation Commission shall hold that office for more than one consecutive term."). Our case law is clear that Jennings' service in office is temporary, will be limited to the time it takes to appoint a qualified successor, and shall be viewed as an extension of his prior term. See *Sweeney v. State*, 23 Ariz. 435, 204 P. 1025 (1922), where we held:

[O]ne elected to [office], and who is the lawful incumbent of the office, is entitled to serve therein not only for what we may call his regular, fixed, or normal term ..., but also for such an additional period following that term as may elapse before the election and qualification of his successor.

... [T]he additional term, though in its nature contingent and defeasible, is, while it exists, as much a part of the term of the incumbent as is his original, fixed, or regular term. Such incumbent is entitled to hold over after the expiration of his regular term, until the happening of both the events mentioned; i.e., the election of his successor and the qualification of such successor.

*Id.* at 441, 204 P. at 1027. *See also Rogers v. Frohmiller*, 59 Ariz. 513, 517, 130 P.2d 271, 272 (1942) ("[R]esignation and the acceptance by the Governor of the resignation would not relieve him from this mandatory duty until his successor was qualified."); *Graham v. Lockhart*, 53 Ariz. 531, 536, 91 P.2d 265, 267 (1939) (The duty to hold over is unaffected by resignation of an incumbent officer and does not "give the officer another term but requires him to continue in the office after his term has expired until, but not beyond, the qualification of a successor.").[18]

### VII. West's Status as a *De Facto* Commissioner

¶ 86 A body of law regarding *de facto* public officials has evolved to ensure that the process of government continues when an official must be removed for failure to meet constitutional or statutory eligibility requirements. In *Jeffords v. Hine*, 2 Ariz. 162, 11 P. 351 (1886), the court explained:

Whatever may be said of the acts of a mere intruder, without any claim or color of title, it is well settled that a person actually obtaining an office, with the legal *indicia* of title, is a legal officer, until ousted, [and] so far as his official acts are concerned, they are as valid as if his title were not disputed. The public have an interest in the continuous and unbroken discharge of official duty, and the necessities thereof, and cannot wait to try the title of conflicting claimants to an office. For

---

17. Ariz. Const. art. V, § 8, provides:

Section 8. When any office shall, from any cause, become vacant, and no mode shall be provided by the constitution or by law for filling such vacancy, the Governor shall have the power to fill such vacancy by appointment.

18. The duty to hold over in both *Graham* and *Rogers* came through statutory provisions, not through the constitution. However, we view the hold over duty to be as strong, if not stronger, when imposed by our constitution and thus find the principles of *Graham* and *Rogers* applicable to Jennings' duty to hold over as commissioner.

this reason it has come to be held, so often as to be now settled, that the official acts of the incumbent of an office, with whom alone the public can, under the circumstances, transact business, shall be regarded as legal. The affairs of society could not be carried on in any other way than by treating as valid the official acts of [a] person *de facto* in office.

*Id.* at 168–69, 11 P. at 355.

¶ 87 Our subsequent cases have established a test for determining if an ousted officer should, while in office, be deemed a *de facto* officer. This court has stated:

An officer *de facto* is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid so far as they involve the interests of the public and third persons, where the duties of the office were exercised ... under color of a known election or appointment [which was] void, because the officer was not eligible....

*Rogers,* 59 Ariz. at 521, 130 P.2d at 274 (quoting *State v. Carroll,* 38 Conn. 449, 9 Am. Rep. 409 (1871)) (emphasis added). *See also Johnson v. Maehling,* 123 Ariz. 15, 18–19, 597 P.2d 1, 4–5 (1979) (declaring registrations valid that were obtained from ineligible registrars); *Campbell v. Hunt,* 18 Ariz. 442, 457, 162 P. 882, 888 (1917) ("With respect to innocent persons dealing with him, he is a lawful officer, so far as the validity of his official acts is concerned.... [H]e is a good officer so far as the interests of the public and third persons require him to be so, and to that extent he is recognized by the law.").

¶ 88 West qualifies as a *de facto* commissioner under *Rogers.* He is not a "mere intruder," as described in *Jeffords,* because he was elected by a majority of the people. He was issued a certificate of election on November 23, 1998, and he took the oath of office on January 4, 1999. These events conferred on West the legal indicia of title to the commissioner post. All decisions in which he took part from January 4, 1999, to this day are therefore valid and legally binding upon the parties affected by the decisions. 59 Ariz. at 521, 130 P.2d at 274. However, from this day forward, West will have no authority to act as a commissioner of the Arizona Corporation Commission.

## VIII. Conclusion

¶ 89 Jennings is a proper *quo warranto* challenger seeking West's removal. Section 40–101 prevents persons in an "official relation" to a regulated entity from being elected to the commission. As a securities license holder, West was such a person at the time of the election and was thus ineligible. These conclusions stem from the plain meaning of sections 40–101 and 12–2043, from related statutes and judicial decisions, from the historical context and intent of the statutes, and importantly, from the obvious purposes behind the statutes.

¶ 90 The claim that Jennings lacks standing as a *quo warranto* petitioner is invalid, as is the assertion that Jennings cannot hold over in office. Indeed, he has a constitutional duty to hold over until his rightful successor qualifies.

¶ 91 The argument that the *Jones* decision restricts the application of section 40–101 solely to public service corporations is without merit. For all the reasons set forth, *Jones* does not control this case. West is thus left in the ironic position of chastising the majority for ignoring legislative intent, while advocating against the plain meaning of the controlling statute, section 40–101. West advocates instead that we follow the dubious interpretation of a case decided eighty-five years ago on a different issue and under vastly different conditions. This we decline to do for the simple reason that section 40–101, as well as principles of good government, demand better.

¶ 92 As a result of today's decision, West must cease functioning as a commissioner. Jennings, the incumbent whose position West took on the commission, retains his term as a holdover commissioner. The decision is effective immediately. Jennings will serve as commissioner until such time as the Honorable Jane D. Hull, Governor, appoints a replacement to fill the vacancy created by West's removal. Ariz. Const. art. V, § 8.

THOMAS A. ZLAKET, Chief Justice, and STANLEY G. FELDMAN, Justice.

MARTONE, Justice, dissenting.

¶ 93   Today's decision, though initially plausible, upon closer examination finds no support in our constitution, cases, or statutes. The majority rejects controlling precedent that has stood as the authoritative interpretation of A.R.S. § 40–101 [1] for eighty-five years and adopts a contrary interpretation that ousts an official duly elected by the people.

## I.

¶ 94   This case is directly controlled by *State ex rel. Bullard v. Jones*, 15 Ariz. 215, 137 P. 544 (1914). Although the majority attempts to distinguish this dispositive precedent, its effort cannot withstand analysis.

¶ 95   Here is what happened in *Jones*. Jones was a corporation commissioner. He was also a shareholder, director, and officer of insurance companies, some of which the corporation commission wanted to audit. Jones disqualified himself from the case. Not satisfied, Bullard, the Attorney General, brought a *quo warranto* action against Jones seeking his removal from office under section 7, chapter 90, Laws of 1912, the predecessor to A.R.S. § 40–101. The complaint alleged that the insurance companies were "subject in whole or in part to regulation by the corporation commission," within the meaning of the statute. 15 Ariz. at 219, 137 P. at 546. In order to understand the meaning of section 7 of chapter 90, we said "it is essential that it be read in connection with all the other provisions of chapter 90." *Id.* at 223, 137 P. at 548. Chapter 90 related to public service corporations, and we specifically looked at section 31, which vested the corporation commission with the power to regulate public service corporations. *Id.* at 224–25, 137 P. at 548.

¶ 96   The Attorney General argued that section 7 "should have a literal interpretation, without regard to its relation to other parts of chapter 90." *Id.* at 225, 137 P. at 548. This is the same argument that the majority adopts here. To this we said:

It is too clear for question that chapter 90 in general purport, meaning, and effect has for its object "public service corporations" and their regulation. Neither in the title of the chapter nor in its body is intimation made that its provisions should reach or affect the regulation of private corporations other than public utilities. That being true, is not the inhibition against a commissioner owning stock or bonds or being interested pecuniarily or as employee or otherwise in a "corporation" confined to "public service corporations"? That is, corporations of which the commission is given "power and jurisdiction to supervise and regulate," as provided in section 31, *supra.*

*Id.*

¶ 97   Jones owned stock in the insurance companies and was an employee and officer of the insurance holding company. Although the holding company was "subject to regulation by the corporation commission," *id.* at 228, 137 P. at 549, we held that the company was "not a 'public service corporation' and does not fall within the purview of either the title or the body of chapter 90, and therefore he is not subject to the penalty therein prescribed for one owning stock of a public service corporation." *Id.* at 226, 137 P. at 548.

¶ 98   This is the holding of the *Jones* case. Section 7 did not apply because it only applies to public service corporations. We went on to give reasons for our holding.

¶ 99   We looked at the constitution. The entirety of Article XV of the constitution applies to the corporation commission. Virtually all of Article XV relates to public service corporations. We noted that Article XV "expressly confers jurisdiction upon the corporation commission to supervise and regulate public service corporations, but its plenary power in that respect is not extended by that instrument to corporations other than public utilities." 15 Ariz. at 226, 137 P. at 548. This was not to say, however, that the constitution only authorized the corporation commission to regulate public service corpo-

---

1.   Section 40–101 is the codification of a conflict of interest provision originally enacted as section 7, chapter 90, Laws of 1912. Although I use

"section 7, chapter 90" in historical context, they are interchangeable.

rations. We acknowledged that in Article XIV, relating to corporations other than municipal corporations, private corporations had to file their articles of incorporation with the corporation commission, Ariz. Const. art. XIV, § 8, and pay fees and make reports to the corporation commission, Ariz. Const. art. XIV, § 17. But we said,

> [t]hese two sections of the Constitution do not empower the corporation commission to regulate "in whole or in part" the corporations mentioned therein.

*Jones,* 15 Ariz. at 226, 137 P. at 549.

¶ 100   We then went on to note that while Article XV, Section 4, authorizes the corporation commission to inspect the books of corporations that are not public service corporations, "[t]he power 'to inspect and investigate' the business of a corporation does not make it 'subject in whole or in part to regulation by the commission.' " *Id.*

¶ 101   Finally, we noted that Article XIV, Section 16, subjects the books of corporations to " 'the full visitorial and inquisitorial powers of the state.' " *Id.* We noted that this provision is not self-executing and that the power is not conferred on any particular body, certainly not the corporation commission. *Id.* at 226–27, 137 P. at 549. We then noted four pieces of legislation that would implement Article XIV, Section 16, and Article XV, Section 4:(1) the regulation and supervision by the corporation commission of co-operating companies; (2) Blue Sky Law regulation and supervision of investment companies by the corporation commission; (3) the regulation of surety companies; and, (4) the supervision and regulation of insurance companies by the corporation commission. *Id.* at 227, 137 P. at 549.

¶ 102   Jones thus owned stock in an insurance company subject to regulation by the corporation commission. The legislation authorizing the corporation commission to regulate the insurance industry specifically prohibited that. Here is what we said:

> The legislature evidently took the view that section 7 of chapter 90 had no application to a state of facts as here appear for in section 1, chapter 94 [insurance statute], *supra,* it prohibited the commissioners and their employees from being interested in

any insurance company, except as a policyholder.

*Id.* at 228, 137 P. at 549.

¶ 103   We thus specifically held that the presence of a conflict of interest section in the insurance statute showed that the legislature understood that section 7, chapter 90 did not apply. Had it applied to anything other than public service corporations, there would have been no need to put a conflict of interest section in the insurance statute.

¶ 104   In addition, had section 7 applied, the ownership of insurance policies, permitted by the insurance statute, would have been barred. If the legislature had intended section 7 to apply, it would not have enacted an inconsistent provision in the insurance statute.

¶ 105   We then said that although Jones was violating the conflict of interest section of the insurance statute,

> [t]he penalty prescribed in section 7 of chapter 90, as we have seen, does not apply, *for by its terms it is restricted to a prohibition of commissioners being interested in public service corporations* "subject to regulation in whole or in part by the commission."

*Id.* (emphasis added).

¶ 106   Because section 7 of chapter 90 did not apply, and because the insurance conflict of interest section did not contain a forfeiture of office penalty provision, we dismissed the *quo warranto* action and Jones was not removed from office.

## II.

¶ 107   It is apparent that *Jones* is dispositive of this case. But how does the majority avoid this result? One must read *Jones* to appreciate the extent to which the majority has been unfaithful to it. The majority says that three factors explain *Jones. Ante,* at ¶ 48. First, the majority says that it mattered that Jones owned his insurance stock and took office before the legislature subjected insurance companies to regulation by the commission. *Id.* But there is nothing in *Jones* to suggest, let alone state, that this mattered to the court. Indeed, we applied

the insurance conflict of interest statute to Jones even though he purchased his stock before the statute was enacted.

¶ 108 Second, the majority argues that the existence of a separate conflict of interest section in the insurance statute controlled the outcome in *Jones*. *Ante*, at ¶ 50. But in *Jones* we recognized that the provision of a conflict of interest section in the insurance statute was evidence that the legislature knew that section 7 of chapter 90 *did not apply* because an insurance company was not a public service corporation. 15 Ariz. at 228, 137 P. at 549.

¶ 109 Third, the majority argues that the legislature enacted a specific insurance conflict of interest provision because it believed that section 7 would otherwise apply to prevent a commissioner from owning an insurance policy. *Ante*, at ¶ 52. But this is directly contrary to what we said in *Jones*: "The legislature evidently took the view that section 7 of chapter 90 *had* no application to a state of facts as here appear, for in section 1, chapter 94, *supra*, it prohibited the commissioners and their employees from being interested in any insurance company, except as a policy-holder." 15 Ariz. at 228, 137 P. at 549 (emphasis added). If the legislature believed that section 7 otherwise applied, all it had to do was to expressly allow commissioners to own insurance policies. But it did far more than that. Because it knew that section 7 did not apply at all, it adopted a completely separate conflict of interest section.

¶ 110 What the majority characterizes as the three factors that explain *Jones*, *ante*, at ¶ 53, are nowhere stated as the grounds for the court's decision. Indeed, here is what the contemporaneous reporter of decisions said:

Held, that the inhibition of section 7 against a commissioner owning stock or bonds or being interested pecuniarily in a corporation relates only to public service corporations, which the commission is given power to supervise and regulate; and hence the ownership of stock in a holding corporation holding all the stock of two insurance companies did not disqualify a commissioner or render his office vacant.

15 Ariz. at 216–17, 137 P. at 544. The reporter's notes, of course, are not part of the court's opinion, but it is comforting to know that the reporter's contemporaneous reading of the opinion is consistent with its plain words.

¶ 111 The majority argues that because *Jones* used the language of section 7 and insurance companies together, that this meant that section 7 was not limited to public service corporations. *Ante*, at ¶¶ 54–55. But the inquiry starts with "regulation," it does not end there. In *Jones*, we specifically acknowledged four instances in which the legislature extended the regulatory power of the commission beyond public service corporations. We expressly acknowledged that it extended the regulatory power to investment companies (Blue Sky laws). But we held that was not sufficient to come within the scope of section 7 of chapter 90 because section 7 applies only to the regulation of public service corporations. In short, commission regulation is a *necessary* but not a *sufficient* condition for the application of section 7. For section 7 to apply, the object of that regulation must be a public service corporation.

¶ 112 Contrary to the majority's statement, *ante*, at ¶¶ 56–57, our detailed analysis did not alter our central holding in *Jones*. After examining other areas "regulated" by the commission, we restated our holding that section 7 was "restricted to a prohibition of commissioners being interested in public service corporations." *Id.* at 228, 137 P. at 549.

¶ 113 The majority says that because not all provisions of chapter 90 were capable of limitation to public service corporations, then neither is section 7. *Ante*, at ¶ 80. But this ignores the fact that the other provisions of chapter 90 which we considered in *Jones*, 15 Ariz. at 224, 137 P. at 548, related only to the organization of the commission and not to its regulatory power. In contrast, section 7 relates to the regulatory power expressly vested in section 31. Contrary to the majority's assertion, *ante*, at ¶ 77, it is not the physical placement of section 40–101 in the codification that matters as much as the fact that

section 7 was enacted as part of chapter 90 of the Laws of 1912.

¶ 114   One need only look at the Session Laws of 1912 to see that section 7 is part of chapter 90, the Public Service Corporation Act. The majority reads section 7 out of context. Nowhere in chapter 90 are securities mentioned. To apply section 7 in a vacuum without regard to the chapter of which it is an integral part is unsound legislative analysis.

¶ 115   I shall not belabor the point more than I already have. *Jones* cannot be distinguished in any material way. The majority has simply overruled *Jones* without acknowledging it has done so.

### III.

¶ 116   Let us turn to the majority's treatment of the language of section 40–101. *Ante,* at ¶¶ 26–44. The critical language is: "A person in the employ of, or holding an official relation to a corporation or person subject to regulation by the commission. . . ."

¶ 117   First, the majority says that "person" includes a natural person. *Ante,* at ¶¶ 28–30. Indeed, section 2(d) of chapter 90 expressly defined "person" to include "an individual, a firm, and a co-partnership." But, the majority's argument is not relevant. The important issue, one which the majority fails to address, is that *a natural person can be a public service corporation.* Note the words "relation to a corporation or person subject to regulation by the commission" in section 40–101. The use of the word "person" does not mean that the statute applies to entities other than public service corporations, for we have specifically held that the definition of public service corporation under Article XV, Section 2 of the constitution "is also applicable to individuals." *Williams v. Pipe Trades Indus. Program of Ariz.,* 100 Ariz. 14, 16, 409 P.2d 720, 722 (1966).

¶ 118   Second, the majority says that because West was licensed to a registered securities dealer, he was a person in the employ of, or holding an official relation to a corporation or a person within the meaning of the statute. *Ante,* at ¶¶ 31–32. But this flatly contradicts our holding in *Jones* in which we specifically held that not all regulation by the commission subjects one to the scope of section 40–101. We said "it is restricted to a prohibition of commissioners being interested in public service corporations 'subject to regulation in whole or in part by the commission.'" 15 Ariz. at 228, 137 P. at 549. The majority does not explain how a securities dealer becomes a public service corporation. The majority just quotes the language of section 7, juxtaposes it against language not in the statute ("licensed by the Commission") and creates a new statute. *Ante,* at ¶ 31.

¶ 119   Third, the majority examines the word "regulation" as though it were interpreting it anew. *Ante,* at ¶ 33. Instead of turning to *Black's Law Dictionary* and *Webster's Collegiate Dictionary,* the court should have turned to *State v. Jones,* where we gave this specific statutory language an authoritative judicial interpretation. As noted above, we looked at each source of constitutional authority for the commission's power to regulate and concluded that none of them empower the corporation commission to "regulate" anything other than public service corporations. *Jones,* 15 Ariz. at 226, 137 P. at 548–49. We then acknowledged that the legislature had indeed granted the corporation commission the power to regulate non-public service corporations (co-operating companies, investment companies, surety companies and insurance companies), but concluded that regulation alone was not a sufficient condition for the applicability of section 7 of chapter 90. Only the regulation of public service corporations comes within the scope of section 7. *Id.* at 228, 137 P. at 549.

### IV.

¶ 120   The majority concludes that the purpose of the statute is advanced by including licensed securities salespersons within its scope. *Ante,* at ¶¶ 65–76. The majority claims that unless we do that, West could function as a commissioner without ever being required to surrender his license. The court says this raises the specter of a conflict. But each member of this court holds a license to practice law and yet we regulate the practice of law. The Board of Medical

Examiners consists of persons licensed to practice medicine, indeed who do practice medicine, and yet it regulates the practice of medicine. A.R.S. §§ 32–1402(A), 32–1403(A). A license qualifies one for the job—it is not the basis for wholesale disqualification.

¶ 121   The majority argues that unless section 40–101 applies, West would be allowed to function as a commissioner even when a conflict of interest arose. *Ante*, at ¶ 67.   In saying this, the majority fails to consider A.R.S. § 38–503,[2] which is a general conflict of interest provision fully applicable to the members of the corporation commission.   Under A.R.S. § 38–503(B), West would have to disqualify himself from sitting on any case involving his own firm's securities dealings.   And, although the majority would like to ignore this statute, *ante*, at ¶ 71, it would operate to prevent the majority's parade of horribles.   The majority's concern over action by a two-member commission, *ante*, at ¶ 70, neglects A.R.S. § 44–1973 which allows the commission to act with fewer than all its members.   And, any deadlock would result in review *de novo* in the superior court under A.R.S. § 44–1981, or by way of special action.

¶ 122   The majority indulges in proclamations about "ethics in government" and "the core of representative government." *Ante*, at ¶ 4. No one could disagree that ethics in government is critical but reliance on such phrases does not advance the inquiry as to whether securities salespersons are within the scope of the section.   They are not. If, after eighty-five years of not including them, the legislature would like to include them, it is free to do so.

¶ 123   It is difficult to measure the damage caused by today's decision.   At a minimum, by taking section 40–101 out of context, persons who own shares of or have a pecuniary interest in any securities company will now be ineligible to serve as a corpora-

tion commissioner.   If owning an insurance policy is having a pecuniary interest in an insurance company, then owning shares in a money market fund issued by Merrill Lynch is having a pecuniary interest in a securities company.[3]   Thus, one who has an individual retirement account at a securities company, perhaps with an interest in the securities company's money market fund, would be ineligible to serve as a commissioner.   This could even include the other two members of the corporation commission.

¶ 124   The majority claims to exclude from its decision shares in unregulated corporations. *Ante*, at ¶ 74.   But after today's decision, what is an unregulated corporation? Until today, we knew with certainty that all corporations except for public service corporations were not within the scope of section 40–101.   But given the majority's broad definition of "regulation," I fear we have not seen the last of this.

V.

¶ 125   *Jones'* limitation of section 40–101 to only public service corporations is supported by Arizona's constitutional history and sound reason.   Two of the three justices of the court that decided *Jones* had served as members of the Arizona Constitutional Convention only two years earlier.   They were keenly aware of the debates over the commission's power to regulate only public service corporations.   And defendant F.A. Jones himself was not only a member of the convention, but also of the convention's public service corporation committee. *The Records of the Arizona Constitutional Convention of 1910*, at 22, 1389, 1390, 1392 (John S. Goff ed.) (hereinafter *Records*).   Thus, our decision in *Jones* was no fluke.   These judges had personal knowledge of the constitutional history that drove their decision.

---

**2.**   Section 38–503(B) provides:

> Any public officer or employee who has, or whose relative has, a substantial interest in any decision of a public agency shall make known such interest in the official records of such public agency and shall refrain from participating in any manner as an officer or employee in such decision.

**3.**   The majority's acknowledgment that the pecuniarily interested language prohibits ownership of an insurance policy, *ante*, at ¶¶ 50–52, does not square with its attempt to limit pecuniary interest to an equity or ownership interest in a regulated entity. *Ante*, at ¶ 75.   In all events, one who owns shares in a securities company's own money market fund or mutual fund has an equity or ownership interest in a regulated entity.

¶ 126 One cannot read Article XV of the Arizona Constitution and not come to the conclusion that the regulation of public service corporations is that which separates the corporation commission from all other public bodies. Article XV, Section 1 creates the commission. Section 2 defines public service corporations, and, as noted, this includes individuals. *Williams v. Pipe Trades Indus. Program of Ariz.*, 100 Ariz. 14, 16, 409 P.2d 720, 722 (1966). Section 3 empowers the corporation commission to regulate public service corporations. The rest of Article XV relates to public service corporations except for Section 4, which contains a limited power to inspect and investigate non-public service corporations, and Section 5, which empowers the commission to issue certificates of incorporation and licenses. We held in *Jones* that Section 4 does not make non-public service corporations subject to regulation by the commission. 15 Ariz. at 226, 137 P. at 549. Instead, we said that implementing legislation was necessary. *Id.* at 227, 137 P. at 549. And, we have held that the legislative power to enlarge the powers of the corporation commission under Article XV, Section 6, is limited to matters over which the constitution has already granted jurisdiction to the corporation commission and other matters of the same class. *Menderson v. City of Phoenix*, 51 Ariz. 280, 285, 76 P.2d 321, 323 (1938). Indeed, we have noted that the commission's authority to regulate the offer and sale of securities comes not from the constitution, but from the legislature. *Commercial Life Ins. Co. v. Wright*, 64 Ariz. 129, 140, 166 P.2d 943, 950 (1946). The same was true with respect to insurance companies. *Johnson v. Betts*, 21 Ariz. 365, 370, 188 P. 271, 273 (1920).

¶ 127 In sum, the corporation commission's power to regulate public service corporations arises directly from the constitution. Its power to regulate anything else arises from statutes. One need only look at the proceedings before the Constitutional Convention to see that the regulation of public service corporations was to be the commission's main responsibility. Authorizing the corporation commission to regulate public service corporations was not disputed. But the delegates argued over whether private corporations should be regulated by the corporation commission. *See Records, supra,* at 613–15, 722–24. They settled on massive, constitutionally-based regulation of public service corporations, but only limited, statutorily-based regulation of private corporations. *See id.; see also Jones,* 15 Ariz. at 226, 137 P. at 548–49; *Arizona Corp. Comm'n v. State ex rel. Woods,* 171 Ariz. 286, 830 P.2d 807 (1992).

¶ 128 This constitutional distinction has its roots in substance. The commission's regulation of a public service corporation is unique. It sets rates and evaluates a fair rate of return. Public service corporations are infected with the public interest and thus the public gets to regulate them in a profound way. This is very different from the sort of regulation contained in the state securities law.

¶ 129 It thus made eminent good sense for this court to have acknowledged that the legislature limited the operation of section 40–101 to public service corporations. Because the regulation was so vast and so continuing, disqualification from office made sense. But as to private corporations, including investment companies and securities dealers, regulation is quite ordinary and could have been vested by the legislature in some other branch of government. Thus the ordinary conflict of interest provisions of A.R.S. § 38–503 are adequate. One would not be disqualified from serving on the commission, but one would simply disqualify oneself from a particular case. The majority's decision ignores this important distinction and upsets a longstanding legislative policy choice.

VI.

¶ 130 For eighty-five years, public institutions and persons have relied on *Jones.* Indeed, as the record makes clear, the corporation commission has consistently advised its employees and commissioners that the draconian scope of A.R.S. § 40–101 is limited to public service corporations. *See* West's app. at 3, 4, 5, 6. For example, the corporation commission's form for new employees entitled "Prohibited Ownership," stated:

I have read ARS § 40–101 which prohibits the ownership of stocks and bonds in public service corporations (utilities) regulated by the Commission.

App. A, attached. Jennings himself signed this form, attesting that he was not violating A.R.S. § 40–101. *Id.*

¶ 131 West and others have relied upon our opinion in *Jones* and the corporation commission's representations. West ran for public office and won. And it was not until then that his opponent raised this issue. I would not overrule a case that has for eighty-five years given the statute an authoritative interpretation. Because it is so plainly unjust to remove an elected official under these circumstances, I respectfully dissent.

CONCURRING: RUTH V. McGREGOR, Justice.

### APPENDIX A

### PROHIBITED OWNERSHIP

I have read ARS 40-101 which prohibits the ownership of stocks and bonds in public service corporations (utilities) regulated by the Commission. I have also read the Memorandum to all Arizona Corporation Commission Employees dated April 27, 1989 which explains the application of ARS 40-101 to employees and their spouses.

APPENDIX A—Continued

NO OWNERSHIP

I (or my spouse) do not own any stocks or bonds in public service corporations (utilities) regulated by the Arizona Corporation Commission.

Renz D. Jennings
EMPLOYEE SIGNATURE

July 7, 1989
DATE

OWNERSHIP

I (or my spouse) own stocks or bonds in a public service corporation (utility) regulated by the Arizona Corporation Commission and I will divest my ownership according to a schedule agreed to between myself and _____ representing the Commission.

_____
EMPLOYEE SIGNATURE

_____
DATE